No. 46,313

*In re* The Estate of Margaret Seeger, Deceased. (Clyde L. Smith and Glenn J. Smith, *Appellants,* v. Wallace C. Sullivan, Administrator of The Estate of Margaret Seeger, Deceased, *Appellee.*)

(490 P. 2d 407)

Opinion filed November 6, 1971.

*George P. Nellans,* of Norton, argued the cause and was on the brief for appellants.

*W. C. Sullivan,* of Phillipsburg, argued the cause and was on the brief for appellee.

*Lowell F. Hahn,* of Phillipsburg, argued the cause and was on the brief as guardian *ad litem* for Gayle Edward Seeger, Incompetent.

The opinion of the court was delivered by

FATZER, C. J.: This appeal stems from a controversy over the appointment of an administrator for the estate of Margaret Seeger, deceased.

The facts which are not in dispute may be briefly stated: Margaret Seeger died intestate on April 11, 1970, a resident of Phillips County, Kansas. She left as her sole and only heir at law an incompetent son, Gayle Edward Seeger, 36 years of age, who was and had been for a number of years a resident of the Winfield State Hospital and Training Center. Also surviving her were two brothers, Clyde L. Smith and Glenn J. Smith, both residents of Jennings, Kansas, and a sister-in-law, Mary Grote—a sister of her deceased husband. Those three persons are the closest living relatives of the incompetent son, who upon his death, would constitute his sole heirs.

On April 17, 1970, Clyde Smith filed a petition for administration, asking that Allen L. Ballinger, a banker at Jennings, be appointed administrator of the estate. Neither the Smiths nor Ballinger were creditors of the estate. The petition was prepared and filed by Wallace C. Sullivan, of Phillipsburg, the family attorney for the decedent and her deceased husband. The hearing was set for May 15, 1970. Proper notice of the time and place of the hearing was duly published and served upon the incompetent at Winfield, as sole heir of the decedent pursuant to K. S. A. 59-2209.

On April 21, 1970, on Sullivan's petition, Lowell F. Hahn, an attorney at Phillipsburg, was appointed guardian *ad litem* for the incompetent son and sole heir. On May 14, 1970, the guardian *ad litem* filed an answer in which he objected to the appointment of Ballinger as administrator and nominated Sullivan to act as administrator. The answer presented the reasons for the objections to the appointment of Ballinger and reasons for the nomination of Sullivan. The reasons were based largely on economy in administration—Sullivan being a local attorney and Ballinger living some sixty miles from Phillipsburg. Service of the answer was not made upon any party until the following day in the probate court.

On May 15, 1970, the hearing for the appointment for an administrator was held in the probate court of Phillips County, the Honorable Martha Kellogg presiding. Others present were Clyde and Glenn Smith, Sullivan, Hahn, and Ballinger. There was some discussion, but it does not appear any evidence was introduced. Following the hearing, Sullivan was appointed and qualified as ad-

ministrator. There were no written findings made by the probate court. A more detailed statement of disputed facts with respect to Sullivan's appointment will be discussed as the specific issues are considered.

On June 4, 1970, Clyde Smith and Glenn Smith appealed to the district court of Phillips County, from the order appointing Sullivan administrator. The district court reappointed and directed the guardian *ad litem* to represent the incompetent heir in the appeal proceedings. The answer of the guardian *ad litem* nominating Sullivan as administrator was renewed in the district court.

The matter came on for trial before the district court and on July 27, 1970, findings of fact and conclusions of law were filed, which we quote in part:

"FINDINGS OF FACT

"W. C. Sullivan is a practicing attorney in Phillips County, Kansas, and for many years has represented the decedent and her husband in their legal matters and was extremely familiar with the property owned by the decedent and of her business affairs. Mr. Sullivan, along with other counsel, also represented the decedent in another case which is presently on appeal to the Supreme Court.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"On May 15, 1970, the Probate Judge of Phillips County appointed W. C. Sullivan as administrator of said estate and directed that he give bond in the sum of Thirty Thousand Dollars ($30,000.00) as such administrator. The petitioner, Clyde L. Smith, was present at the time of the hearing and the appointment of Mr. Sullivan and made no objection to his appointment at that time.

"An appeal was filed on June 4, 1970, by Clyde L. Smith and Glenn J. Smith, and a trial *de novo* was held in the District Court. On June 16, 1970, one Lena East was appointed as guardian of Gayle Edward Seeger and on July 6, 1970, filed in the Probate Court a request for the appointment of W. C. Sullivan as administrator of the Margaret Seeger estate."

"CONCLUSION OF LAW

"The Court finds that the order of the Probate Court appointing W. C. Sullivan as administrator of the estate of Margaret Seeger, deceased, was proper in all respects; and that under the decisions of the Supreme Court of Kansas, the guardian *at litem* was entitled to select or recommend such administrator since he represented the sole heir of the decedent."

In harmony with its findings and conclusions, the court appointed Sullivan as administrator. Thereafter, Clyde Smith and Glenn Smith perfected this appeal.

The appellants present eight points for reversal. They have abandoned their seventh point, and as the eighth point becomes

largely immaterial if the administrator was properly appointed, we proceed to consider the first six points which the appellants have consolidated in their brief for argument as·presenting the following separate issues:

1. Was the probate court obligated to appoint the nominee named in the petition as administrator, absent a finding of incompetency or unsuitability?

2. Did the district court err in appointing the petitioner's attorney as administrator because of an alleged conflict of interest?

With respect to the first question, the appellants rely heavily on K. S. A. 59-705 which reads:

"Administration of the estate of a person dying intestate shall be granted to one or more of the persons hereinafter mentioned, suitable and competent to discharge the trust, and in the following order:

"(1) The surviving spouse or next of kin, or both, as the court may determine, or some person or persons selected by them or any of them.

(2) If all such persons are incompetent or unsuitable, or do not accept, administration may be granted to one or more of the creditors, or to a nominee or nominees thereof.

(3) Whenever the court determines that it is for the best interests of the estate and all persons interested therein, administration may be granted to any other person, whether interested in the estate or not."

The appellants contend that since there was no surviving spouse and the son was incompetent, they were next of kin and had the right to control the appointment under the statute. The point is not well taken. "Next of kin" means those who inherit from the decedent under the law of descent and distribution. Although this court has not had occasion to interpret the phrase as used in the particular statute, it did so in a case involving the Wrongful Death Statute. In *Ellis v. Sill,* 190 Kan. 300, 374 P. 2d 213, the third paragraph of the syllabus reads:

". . . 'Next of kin' means those who inherit from a decedent under the law of descents and distributions."

The appellants would no doubt be next of kin of the incompetent son—their nephew, however, they are not the next of kin of the decedent. The statute does not recognize the next of kin of the next of kin of the deceased in the selection of an administrator. The only person recognized by the statute is the incompetent son —the surviving heir at law and the next of kin. Being incompetent, a guardian *ad litem* was properly appointed to represent him. The guardian *ad litem* then stood in the position of the incompetent

son and next of kin. This question was disposed of in *In re Estate of Paronto,* 163 Kan. 85, 180 P. 2d 302. There, this court had under consideration facts very similar to what we have here except the next of kin was a three-year-old child, and therefore incapable of selecting a nominee as administrator. In the opinion it was said:

"G. S. 1945 Supp., 59-705, provides that letters of administration shall be granted to persons of certain classes, providing they are suitable and competent to discharge the trust. The section also provides in what order they shall be given preference. In the first designated class is 'the surviving spouse.' There was no surviving spouse here since Mrs. Paronto was a widow. Next in that class is named 'the next of kin.' The next of kin here was a three-year-old boy. Obviously he could not be appointed. We have demonstrated, however, that it was the duty of the court to name a guardian *ad litem* for him. Had the court done this the guardian would have filed a pleading and selected some person on behalf of the minor and next of kin whom he wished, in compliance with the statute, to have appointed. The probate court would then have had the duty and power to exercise its discretion as to whether any such persons were incompetent or unsuitable. It would have been necessary, however, that this finding be based on evidence and not made by the court without any evidence whatever, as was the case here. . . ." (l. c. 94.)

In the case at bar, a guardian *ad litem* was appointed and he did by proper pleading based upon valid reasons, select Sullivan on behalf of the incompetent next of kin. When the probate court determined Sullivan was suitable and competent to discharge the trust, the statute required his appointment. (*In re Estate of West,* 165 Kan. 483, 195 P. 2d 616.) There was no abuse of discretion by the court and the appellants' contention cannot be sustained.

The appellants next contend the appointment of Sullivan as administrator was improper because at the time he was employed by the petitioner Clyde Smith to obtain the appointment of the nominee named in the petition, and his acceptance of the appointment constituted a conflict of interest. They direct our attention to EC 5-15 of the Code of Professional Responsibility, approved in principle by this court in Rule No. 501, which reads:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests . . ."

Our attention is also directed to DR 5-101 (A) of the Code of Professional responsibility, adopted by the court in Rule No. 501, which reads:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

The question was also passed upon in *State v. Leigh,* 178 Kan. 549, 289 P. 2d 774, wherein it was said:

". . . The inviolate rule has long been firmly established both in the Canons of Professional Ethics and by judicial opinions that attorneys cannot represent conflicting interests or undertake to discharge inconsistent duties. When an attorney has once been retained and received the confidence of a client, he cannot enter the services of those whose interests are adverse to that of his client or take employment in matters so closely related to those of his client or former client as, in effect, to be a part thereof. . . ." (l. c. 552.)

See, also, *State v. Young,* 196 Kan. 63, 410 P. 2d 256.

Of course, with the consent of the client after a full disclosure, an attorney is not so restricted in a situation such as we have here. At most, under the circumstances, only potentially differing interests existed. The guardian *ad litem* had nominated Sullivan in opposition to the nominee of the petitioner. The petitioner might well have desired Sullivan's appointment if his nominee was to be opposed by the guardian *ad litem.* We must examine the record to see if the petitioner was fully informed of the situation and consented to the appointment of his attorney either by direct or implied consent. The matter was fully covered by the evidence before the district court.

Martha Kellogg, the probate judge, testified:

"Q. Martha, I will ask if you recall the day, was it June 15th, that we had this hearing on the Margaret Seeger Estate for the appointment of administrator in your court?

"MR. NELLANS: Your Honor, I don't want to be picklish, but I think it was May 15.

"A. I was going to say I thought it was earlier than that.

"Q. Do you recall an objection was made to the appointment of Mr. Ballinger by the guardian ad litem, Lowell Hahn?

"A. Yes.

"Q. And, that the guardian ad litem submitted my name, W. C. Sullivan, as nominee to be appointed for administrator?

"A. That is correct.

"Q. And then what happened from thereon, can you recall?

"A. Well, after we had some discussion, I asked you whether you would accept this job as being administrator and you said that you would if it was all right with the Smith brothers. But you wanted everybody to be satisfied and I don't remember the whole conversation at the time, but nobody objected to having you appointed at the time.

"Q. Did Clyde Smith say at that time, 'We have got to have an administrator?'

"A. Yes, he did.

"Q. That's all."

She further testified:

"MR. HAHN: You were under the impression, weren't you, Martha, that I did object to Mr. Ballinger, not on the basis of being incompetent but on the basis of being suitable?

"A. Yes, I think you mentioned that that day.

"Q. And there was no objection, no disagreement to having Mr. Sullivan appointed at that particular time, and that's why you went ahead and did it the way you did?

"A. That's right, there was no objection.

"Q. There was no real controversy for you to go ahead and make a journal entry as I recall?

"A. That's right."

Mr. Sullivan testified:

"Q. Mr. Sullivan, did you file the petition for Mr. Smith?

"A. I prepared it and came over to the Courthouse with him and filed it.

"Q. And you have heard testimony here in the Courtroom as to what occurred at the hearing?

"A. I did.

"Q. Did you ask the Smith brothers if they had any objections to you serving as administrator?

"A. When the Court asked me if I would serve as administrator of the Margaret Seeger Estate, I explained to her, Mr. Ballinger, and the Smith boys, Glenn and Clyde, that I had filed the petition for them, I wouldn't want to serve as administrator unless it was all right with them; and I turned around to them and asked them.

"Q. What did they say?

"A. Clyde said, 'Well, we have got to have an administrator' and I don't believe Glenn said anything.

"Q. Did Mr. Ballinger say anything?

"A. Mr. Ballinger said nothing.

"Q. In any event, there was no objection raised and the Court issued letters to you, didn't she?

"A. There was no objection raised. The Court issued letters to me. I talked to the Smith boys and Mr. Ballinger going down the walk from the Courthouse and everything was lovely. They were perfectly satisfied with my appointment."

Mr. Leon Kinter, who was employed by the decedent as a hired hand to operate the farm, testified:

"Q. Just as near as you can, relate the conversation between you and Peg.

"MR. NELLANS: I will object to it between you and—I will object to it as a matter of form. I don't think he can relate a conversation like this.

"THE COURT: Overruled.

"A. Just said about making out a will. She talked about that. I just told her go make a will, to go to Wallace Sullivan and make out a will regardless of who it hurts.

"Q. What else did she say, anything?

"A. Just kind of stopped then, that was all of it, but we said that several times. I had always just told her to go make out her will.

"Q. Did she say anything about her estate, who she wanted to handle it or anything?

"A. Yes.

"Q. What did she say?

"A. Wallace Sullivan.

"Q. She said she wanted Wallace Sullivan to handle her estate?

"A. Absolutely."

Clyde Smith testified that before the hearing in the probate court, he had not been informed and had no reason to think his nominee, Ballinger, would not be appointed administrator. He testified on direct examination as follows:

"A. Well, Mr. Hahn suggested that Wallace Sullivan should be the administrator.

"Q. You say Mr. Hahn, are you referring to Lowell Hahn here?

"A. That's right.

"Q. He suggested that Mr. Sullivan should be the administrator?

"A. Yes.

"Q. And, did you consent to Mr. Sullivan being the administrator?

"A. No, I didn't.

"Q. Did Mr. Ballinger consent to Mr. Sullivan being the administrator?

"A. No, he didn't.

"Q. Did Mr. Sullivan ask you if it was all right with you if he were administrator?

"A. He asked if Ballinger had anything to say and he said not at the present time.

"Q. Did you have anything to say at that time?

"A. I didn't approve of it, either way. I was just kind of shocked.

"Q. Do you approve of his being appointed administrator today?

"A. No, I don't approve of it."

He further testified on cross-examination:

"MR. SULLIVAN: Probate Court's office, and after Mr. Hahn nominated me or submitted my name to be administrator, what did the Court do, what did Martha Kellogg do? Did she ask me if I would serve?

"A. Yes, she did.

"Q. What did I say?

"A. You said you'would.

"Q. Is that all I said? Did I say that I had filed this petition for you and I wanted it to be all right with you boys, didn't I say that?

"A. I don't remember that.

"Q. And didn't you say, 'Well, we have got to have an administrator?

"A. No, you asked if we were satisfied and I never said yes or no."

❈ ❈ ❈

"THE COURT: What's your objection to Mr. Sullivan being appointed, Mr. Smith?

"A. I felt like it would be just a little bit better if we had somebody out there (Jennings, Kansas) to be closer to us.

"THE COURT: Why, isn't the property all down here (Phillips County)?

"A. Yes, but he (Ballinger) was qualified just as well as anybody else."

Considering the record before the district court, we are of the opinion Sullivan did not change sides in the controversy. He acted only upon the nomination of the guardian *ad litem* who had the statutory preference of nomination, after the probate court found him to be competent and suitable for the trust, and then only after he explained to the court, Ballinger, and the Smith brothers that he had filed the petition for administration for them, and would not serve as administrator "unless it was all right with them." When Sullivan asked the Smith brothers for their consent, no objection was made, and Clyde said "[w]ell, we have got to have an administrator." As they walked from the courthouse following the hearing, Ballinger and the Smith brothers expressed satisfaction with Sullivan's appointment.

It would be difficult under the facts stated to conclude the appellants were not fully apprised of what was taking place. It would be equally difficult to hold they did not at least give their implied consent to Sullivan's appointment. Implied consent is defined in 15A C. J. S., Consent, p. 576, as follows:

"That which is manifested by signs, actions, or facts, or by inaction or silence, from which arises an inference that the consent has been given. It exists where a person by his line of conduct has shown a disposition to permit another person to do a certain thing without raising objection thereto."

In the district court, Clyde Smith testified that when asked if he was satisfied, he did not say yes or no. Sullivan and the probate judge testified that when asked if he had any objection to Sullivan being appointed administrator, he replied, "well, we have got to have an administrator." The appellants may not consent to the

appointment of an administrator in the probate court, and then object to the appointment on appeal to the district court.

The record has been carefully examined and other claimed errors of the appellants considered. We find no error which would justify a reversal of the decision. The judgment is affirmed.

FROMME, J., dissenting. In the majority opinion this court gives lip service to our Code of Professional Responsibility but permits a violation of one of the basic rules guiding every lawyer—integrity and loyalty to his client. (See *Haverty v. Haverty*, 35 Kan. 438, 11 Pac. 364, and *New v. Smith*, 86 Kan. 1, 119 Pac. 380.) There is no profession in which so many temptations beset the path of him who is to serve with strict integrity and loyalty. There are pitfalls at every step to be avoided if the integrity and good name of the bar and of the administration of the law are upheld. A lawyer must exercise prudence and self-denial as well as moral courage if he is to maintain the high ethical standards expected of lawyers.

The Utah court in *Smoot v. Lund*, 13 Utah 2d 168, 369 P. 2d 933 expresses it in these words:

". . . [A lawyer's] fiduciary duty is of the highest order and he must not represent interests adverse to those of the client. It is also true that because of his professional responsibility and the confidence and trust which his client may legitimately repose in him, he must adhere to a high standard of honesty, integrity and good faith in dealing with his client. He is not permitted to take advantage of his position or superior knowledge to impose upon the client; nor to conceal facts or law, nor in any way deceive him without being held responsible therefor." (p. 172.)

The Connecticut court in *Grievance Committee v. Rottner*, 152 Conn. 59, 203 A. 2d 82, had this to say:

". . . When a client engages the services of a lawyer in a given piece of business he is entitled to feel that, until that business is finally disposed of in some manner, he has the undivided loyalty of the one upon whom he looks as his advocate and his champion. If, as in this case, he is sued and his home attached by his own attorney, who is representing him in another matter, all feeling of loyalty is necessarily destroyed, and the profession is exposed to the charge that it is interested only in money." (p. 65.)

In the present case when W. C. Sullivan undertook to have Allen L. Ballinger appointed administrator of the estate of Margaret Seeger, deceased, he did so as attorney for Clyde and Glenn Smith. The relationship between lawyer and client attached when the work was begun and it continued thereafter until the lawyer-client rela-

tionship was terminated. W. C. Sullivan owed to Clyde and Glenn Smith strict integrity and loyalty, not only to them as clients but to their cause. Clyde and Glenn Smith had a right to expect no less than this.

The record before this court clearly shows that Clyde and Glenn Smith attended court on May 15, 1970, believing that their choice of administrator, Allen L. Ballinger, would be appointed and that W. C. Sullivan with strict integrity and loyalty would contend for that cause. They knew nothing about the prior appointment of Lowell F. Hahn as the guardian *ad litem* or of prior communications between their attorney and the guardian *ad litem*. On the day of hearing while in open court they first learned the only other attorney in court (Mr. Hahn) objected to the appointment and their attorney seemed to agree with him. It is small wonder under these circumstances that the client, Clyde Smith, at a loss for words, said, "Well, we have got to have an administrator." The other client, Glenn, said nothing. When Clyde was asked as a witness if he consented to Mr. Sullivan being appointed he answered, "I didn't approve of it, either way. I was just kind of shocked."

Under the foregoing circumstances W. C. Sullivan was not a suitable person to discharge the trust. He was bound by the lawyer-client relationship to contend for the appointment of Mr. Ballinger and his clients had a right to expect no less. (See *In re Strosnider*, 180 Kan. 480, 483, 305 P. 2d 1058 as to dual representation.) The guardian *ad litem* had no prior right. The court by appointment could not erase the conflict of interest and personal self-interest which W. C. Sullivan had. Only his clients could do this.

The consent which the majority uses to justify their decision is superficial and found to exist in total disregard of the reasons for the rule which disqualifies the attorney. Consent by implication should not be recognized in cases of this kind. The integrity and good name of the bar and of the courts cannot be thus maintained in the eyes of the public. Full disclosure as required in the disciplinary rule is not made when a client and his cause is abandoned in open court during the hearing, and without advance notice, by saying, "I wouldn't want to serve as administrator unless it was all right with them."

Full disclosure should require that the alternatives available be explored with the client. In this case adjournment of the hearing should have been requested. The clients should have been advised

of their right to hire another attorney to prosecute their case if they so desired. They should have been advised that Mr. Sullivan was not suitable as the administrator because of his duty to contend for the appointment of Mr. Ballinger and that only they could remove that unsuitability. The clients should in no case be forced into a consent, implied or otherwise, without an explanation of the exact nature of the conflicting interests which Mr. Sullivan proposed to embrace. They had a right to know and understand the possible effect the conflicting interest would have upon the client-attorney relationship previously existing between them.

There was no full disclosure of interest by W. C. Sullivan in this case. There was no consent by his clients for him to engage in the conflicting interest as the administrator. Therefore he was unsuitable by reason of the conflicting interest to be appointed regardless of whether his appointment was urged by the guardian *ad litem* of the sole heir or anyone else. (See *Wilson v. Wahl,* 182 Kan. 532, 322 P. 2d 804.)

The judgment appointing W. C. Sullivan should be reversed and the case remanded.

SCHROEDER, J., joins in the foregoing dissent.