(571 P.2d 350)
No. 48,588

ELEANOR JEAN ALEXANDER, *Appellant,* v. ANTHONY RUSSO, *Appellee,* and TRAVELERS INSURANCE COMPANY, *Defendant.*

Petition for review denied September 28, 1977.

Opinion filed August 12, 1977.

David W. Carson and John H. Fields of Carson, Fields & Boal, of Kansas City, for the appellant.

David W. Russell of Duncan & Russell, of Gladstone, Missouri, and Barbara M. Vache of Stevens, Vache & Alexander, of Kansas City, for the appellee.

Before HARMAN, C.J., FOTH and SPENCER, JJ.

SPENCER, J.: In this action to recover a reward for the return of stolen property offered by the defendant Travelers Insurance Co., plaintiff Alexander sued Travelers and a rival claimant Russo. Travelers paid the reward money into court and did not participate further. Trial to the court resulted in judgment for Russo and plaintiff has appealed.

Sometime around July 1, 1973, a sheet of platinum rhodium alloy with a value in excess of $61,000 was stolen from the Certain-Teed St. Gobain Co. in Kansas City, Kansas. The resulting police investigation, as well as the investigation conducted by Travelers, proved unproductive.

In early or mid 1974, Alexander learned that her son had been involved in stealing the platinum and had it in his possession. At that time her son gave her a small sample of the platinum which she took to two individuals in what she described as an attempt to have the material analyzed. Both individuals testified, however, that Alexander had attempted to sell the platinum through them.

In May, 1974, Alexander was arrested for shoplifting and Russo, who was then a practicing attorney at law in Kansas City, was employed to represent her at her trial in municipal court which occurred on June 24, 1974. Russo testified that it was on May 24th that Alexander retained him and at that time paid him $170 of an agreed fee of $250. His testimony was that the remainder of that fee is still owing. At the trial on June 24 Alexander was convicted and Russo stated that they thereafter filed an appeal from that conviction, which was abandoned when Alexander was placed on probation. Just when the appeal was abandoned is not made clear by the record.

Following her trial on June 24, and prior to July 9, 1974, Alexander visited Russo in his office. Her testimony was to the

effect that she then sought Russo's assistance in returning the platinum to the rightful owner; that she wanted to do this in order to keep her son out of trouble; and that she was not then certain whether the material was actually platinum. Her claim is that she then gave Russo an additional $200 for which he did not issue a receipt, and that he made no commitment but said that he would see what he could do. Russo testified that on this visit Alexander brought some eggs to his office and asked him if he was interested in investing any money or making any money. Russo asked her what it was about and she then told him there were two black individuals who rented from her who had some platinum that she could get; that if they could afford to buy it, they could then sell it and make money or find a buyer and in effect broker it. Russo said he would have to look into the market for platinum before deciding because "I wasn't interested in doing that at that particular time unless I knew there was a market for it." Russo denied that she said she wanted to hire him to try to get the platinum back to the owner and he also denied that she paid him any compensation in addition to that which had already been paid on the fee due him for representing her on the shoplifting charge. He testified, however, that he did ask Alexander for the balance of his fee and that she then indicated she would pay it and would also guarantee payment of the portion owed by another lady who had been involved with her on that charge. Russo claims that there was no attorney-client relationship established between them at that time, nor had any such relationship existed subsequent to the hearing in municipal court on June 24, 1974.

On July 9, 1974, Russo made contact with one Donald D. Hall who was then a police inspector in Kansas City. Russo stated that he asked Hall to check and see if any platinum had been stolen. Inspector Hall elaborated on this meeting in his confidential report of July 29, wherein it is stated:

"On July 9, 1974, I talked with a man whose initials are T.R. who . . . *informed me that he had come in contact in his course of business with a lady by the name of Jeannie Alexander*, C/F, approximate age 45. He stated this female had told him and had actually approached him to purchase or dispose of a large sum of platinum. He requested that I get with him at a later date and he would furnish me with the lady's address and phone number and would try to contact the lady again to receive more information in regards to this matter if I was interested in solving this crime." (Emphasis added.)

Russo was subsequently identified as the "man whose initials are

T.R." in the report. We make special note of the fact that Russo told Hall that he had come in contact in his course of business with a lady by the name of Alexander.

On July 20 and 21, and apparently on July 23, 1974, Travelers published an offer of reward in two local newspapers. The form and content of the published offer are not deemed important for the purposes of this opinion.

The confidential report prepared by Inspector Hall further reflects that a meeting was held in Russo's office on July 29, 1974, which is described as follows:

"On this date at approximately 11:20, the reporting officer along with Detective Floyd Smith drove to the office of Mr. T.R., and he informed us that he had been in contact with Jeannie Alexander who related the following information to him. That she had a couple of negro males who were living in some of her rental property who had told her they had stolen $80,000 to $90,000 of platinum and they were willing to sell this for $15,000 to $20,000. If Mr. T.R. wished to assist her in purchasing the platinum, she would set up a buy. *He told me he informed this lady not to do anything until he had time to look into the matter and he then passed this information along to myself. He informed me that up to this time the lady has not committed a crime and he does not wish for her to commit a crime;* and if I could think of a way to recover the platinum without this lady committing a crime, he would be happy to assist me in this matter." (Emphasis added.)

On July 31, 1974, Alexander was called to police headquarters by Hall for what she said she presumed to be an interview regarding property which had been taken from her home. Alexander testified that when Inspector Hall came in he introduced himself and said, "You'd better call your lawyer." Her reply was, "Call my lawyer? For what? I haven't done anything." Hall replied, "You are going to need your lawyer because you've got something that belongs to me and I intend to get it before you leave here today." Alexander further testified that as a result Russo was contacted and, after some time had elapsed, did arrive at police headquarters, at which time he requested to be permitted to "talk to my client alone." Alexander said that in their private conference Russo inquired as to whether she had told them that he knew anything about the platinum, to which she replied in the affirmative, and as to whether she had the platinum, to which she replied in the negative. She said that Russo then also advised her, "You go ahead and tell the police." She then asked him if he might represent her son and he said, "No, because it would be a conflict of interest if I'm representing you, I can't represent your son." Her testimony was that Russo then told

Inspector Hall that Alexander had not committed any crime and that it was all right for her to give a full statement.

Russo's testimony with regard to this meeting was that he did not in fact receive a telephone call but happened to be in police headquarters when Inspector Hall stopped him and told him that Alexander was in his office and had told him (Hall) that her son had stolen the platinum. He then testified:

"Q. Did you ask to talk to her in private?

"A. Yes.

"Q. And what was the reason for asking to talk to her in private?

"A. Because I thought she was getting herself in a pickle there. She had changed the story from the story she had told me.

"Q. And so what purpose did you hope to accomplish by talking to her in private?

"A. Hoping I would straighten her out so she wouldn't get herself involved in a crime and be convicted of something.

"Q. And did you then give her some advice as a result of that conference?

"A. Did I give her advice?

"Q. Yes.

"A. I told her to tell the truth and she wouldn't be any problem because Corky Hall was a man of his word. If he told her something he would stick by it.

"Q. And in essence did you tell her to go ahead and give the police a full statement of everything?

"A. She had already given a statement.

"Q. Did you tell her to go ahead and give a complete written statement?

"A. I told her, the conversation was that if she wasn't involved they wouldn't charge her, and I said, 'Just tell them the truth. If you told me the truth just now then you are all right, go ahead and tell them the truth and you won't have any problems.' "

Hall testified that Alexander had asked to see a lawyer and that he tried to call Russo for her as she indicated Russo was the one she wanted to talk to. He further stated that he assumed she would retain Russo in this matter. Hall also confirmed the fact that Alexander had told him about her son and the theft of the platinum prior to Russo's arrival and that Russo did ask to talk to Alexander alone when he arrived. At this meeting, and after Russo had talked to Alexander, she signed an instrument entitled "Waiver of Rights," which contained the statement "I do not want a lawyer at this time." Her signature to this instrument was witnessed by an F.B.I. agent and Russo. Alexander then gave a written statement to Inspector Hall in which she recited her knowledge of the theft, and from which the police were able to identify the culprits and recover the platinum. Although this

statement indicated that it was given "in the presence of her attorney Tony Russo," the evidence indicated that Russo left police headquarters immediately after he had signed as a witness on the Waiver of Rights and he was not in fact present during the taking of the written statement from Alexander.

Following the revelations made on July 31, 1974, the police arrested Alexander's son, who led them to the platinum, and recovery was made on August 5, 1974.

Russo testified that he knew of the reward offer from July 26th, and on August 6 and October 2, 1974, Russo made formal claim to the reward. Alexander testified that she knew on July 31st and on August 2nd, while talking to the police, that Russo had started the whole thing and must have been the one that turned her in; and that she had no intention of going to the police because "I didn't know the police that well." She also testified that she did not know about the reward until her son had gone to trial and his attorney had made reference to it in court. Sometime thereafter she made claim to the reward under the fictitious name of "Alice Carlos."

The trial court found that there was no attorney-client relationship existing between Russo and Alexander; that Russo's actions in giving information to the police led to the ultimate recovery of the platinum; and that Russo should receive the reward.

On appeal, Alexander argues that the trial court erred in concluding that no attorney-client relationship existed between Russo and herself, and that if such a relationship existed, public policy should prohibit Russo from receiving the reward under circumstances that amount to betraying the confidences of a client. In the alternative, she argues that if no attorney-client relationship existed, Russo owed a duty as a lawyer to report any information he had of the theft and that public policy should prohibit him from receiving the reward for doing what his duty required him to do. Finally, she argues that the recovery was effected through information supplied by her, not Russo, and that the information Russo did supply was given prior to the offer of the reward and thus failed to establish a contract for its payment.

We first consider the issue of the attorney-client relationship. It is undisputed that such a relationship existed on June 24 when Russo represented Alexander on the shoplifting charge. The trial

court found, with some support in the evidence, that when Alexander visited Russo between June 24 and July 9, she did so not in order to retain him, but in an attempt to sell the platinum.

We note, however, that this meeting was within and no more than fifteen days after the admitted representation of Alexander by Russo on June 24th.

"The relationship of an attorney to his client is fiduciary in character, binding the attorney to the highest degree of fidelity and good faith to his client on account of the trust and confidence imposed." (*Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, Syl. 3, 553 P.2d 254.)

In 7 Am.Jur.2d, Attorneys at Law § 98 at 110 it is said:

". . . [I]t has been emphasized that the duty of fidelity and good faith imposed upon the attorney in dealing with his client is founded, not on the professional relation per se, but on the influence created by the relation, and that the duty does not always cease immediately on the termination of the relation but continues as long as the influence created by that relationship continues to exist."

See also 7 C.J.S., Attorney and Client § 125 at 959; *Colstad v. Levine,* 243 Minn. 279, 67 N.W.2d 648 (1954); *Conner v. Hodgdon,* 120 Wash. 426, 207 Pac. 675 (1922).

May it truly be said that when Alexander visited Russo at his office, and talked to him about the platinum for whatever purpose, and he told her that he would have to look into the market for platinum before making a decision, and at that time they discussed the balance of the fee due him as her lawyer, that his duty as an attorney in dealing with his client had terminated and that the influence created by their former relationship no longer existed?

We do not here conclude that the trial court erred in finding that the attorney-client relationship between Russo and Alexander did not exist during the period of June 24 to July 9 and again on July 29 when Russo gave Alexander's name to the police. However, we do conclude from the evidence presented by this record, and particularly from the statements and admissions made by Russo, that the influence created by that relationship on June 24, 1974, had continued during this period of time and, accordingly, the duty owned by Russo as the attorney for Alexander had not terminated. We believe there is no doubt but that his contact with Alexander at least initially was by reason of his capacity as an attorney at law and was in the course of his business, and that he was in fact trying to prevent her involvement in a crime.

It is obvious that the information given to the police by Russo on July 9 and 29 was only that he was in contact with someone who might provide the information necessary for recovery of the platinum. Information in detail had not been elicited until the meeting at police headquarters on July 31st when Alexander elected to reveal the facts to the police. As a result of her conference at that time with Russo in which he advised her to tell the truth, she elaborated on these facts and gave a written statement.

When Russo as a practicing attorney at law undertook to confer with Alexander at police headquarters to "straighten her out so she wouldn't get herself involved in a crime and be convicted of something," the relationship, and not merely the influence, of attorney and client was re-established and continued throughout the period during which Alexander gave her statements to the police on the strength of Russo's advice to her. This is true even though Russo was not paid and did not thereafter represent Alexander.

The relation of attorney and client can be created by express or implied contract. (*Caldwell v. Bigger,* 76 Kan. 49, 90 Pac. 1095.) The establishment of the relation is not dependent on the payment of a fee. (7 C.J.S., Attorney and Client § 65b at 849; 7 Am.Jur.2d, Attorneys at Law § 91 at 105.)

DR 5-101 (A) of the Code of Professional Responsibility provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." (214 Kan. lxxxv.)

During the conference on July 31st, Russo was aware of the reward offer and did not disclose that fact to Alexander. He advised her to tell the truth and that she wouldn't have any problems. It was only after this advice that Alexander executed the "Waiver of Rights" and gave her written statement to the police incriminating her son. The trial court did not address itself to this particular question, but we conclude that on July 31st Russo did in fact represent Alexander as her attorney and that his advice to his client was in effect—you go ahead and tell the police the whole story and after you have done so I will be able to collect the reward and you will not be the wiser. Would Alexander have

been so cooperative had she been aware that Russo intended to make claim to the reward? We believe not and conclude that Russo was at that time confronted with an election either to refuse to confer with Alexander for any purpose or to make a full disclosure of the reward and of his involvement.

As a member of the legal profession, a lawyer must conduct his professional life with great circumspection and must tread that somewhat narrow path in a manner compatible with the Code of Professional Responsibility. He shall not violate a disciplinary rule nor engage in conduct involving dishonor, fraud, deceit, or misrepresentation, nor engage in conduct that is prejudicial to the administration of justice. [DR 1-102 (A) (1), (4), (5).] He must preserve the confidence and secrets of his client whenever that relationship exists and he must not use a confidence or secret of his client for the advantage of himself unless the client consents after full disclosure. [DR 4-101 (A) and (B).] He may, however, reveal the intention of his client to commit a crime and the information necessary to prevent the crime. [DR 4-101 (C) (3).] He must avoid even the appearance of professional impropriety. [DR 9-101.]

A practicing attorney at law in our society is one to whom confidences and secrets of the client and the prospective client must necessarily be imparted, and to permit the attorney to reveal such confidences and secrets to another for the purpose of his own enrichment, and without full disclosure to the client, would be unconscionable. The relationship between an attorney and his client is one of the highest trust and confidence and, as long as that relationship or the influence of that relationship may exist, the attorney must observe the utmost good faith and candor and must not allow his private interests to conflict with those of his client. Cf. *In re Estate of Seeger,* 208 Kan. 151, 490 P.2d 407.

We conclude that throughout the period of his original retainer by Alexander in May, 1974, to and including the conference between Russo and Alexander on July 31, there was sufficient influence created by the times when the attorney-client relationship did in fact exist that it would violate all sense of propriety and be contrary to public policy to permit recovery of the reward by Russo.

Having so determined, we need not decide whether a lawyer has a duty, incident to his profession, to report to the appropriate

authorities any unprivileged information he might have regarding a completed crime, and whether that duty would preclude him from collecting a reward for furnishing such information. In this regard see American Bar Association Committee on Ethics and Professional Responsibility, Informal Opinion 1210 (February 9, 1972) describing the lawyer's duty of disclosure in such a situation to be that of a "good citizen." We note that it is against public policy for an officer to receive a reward for the performance of his official duty (*Williamson v. Labette County Comm'rs,* 122 Kan. 349, 252 Pac. 466), but that nothing prohibits recovery of a reward for actions by an officer where he is under no obligation arising from his official character to perform the service. (*Elkins v. Wyandotte County,* 91 Kan. 518, 138 Pac. 578; *Montgomery County Comm'rs v. Johnson,* 126 Kan. 36, 266 Pac. 749.)

The issues of which of the parties provided the information which led to the recovery, and whether there was an enforceable contract established, need not be discussed as to Russo.

What about Alexander? As previously noted in this opinion, the disclosures finally made by her were not in any manner motivated by the offer of reward, of which she was then unaware and of which she knew nothing until well after the recovery of the platinum had been accomplished. As stated in *Taft v. Hyatt,* 105 Kan. 35, 180 Pac. 213:

"A private offer of reward for the apprehension of an accused person stands, as a general rule, upon a different footing from an offer made by virtue of a statute. When accepted, the offer becomes a contract; until it is accepted by some person, who upon the strength of the offer takes some steps to earn the reward, there is no contract; and where a claimant of the reward was not aware that it had been offered until after he had acted, he is not entitled to claim the reward." (Syl. 3.)

We see no reason why this rule should not apply to an offer of reward for the return of stolen property. It therefore follows that Alexander, being unaware of the reward when she implicated her son in the crime, did not thereby accept the offer of the reward and is not entitled to recover. Alexander argues, however, that Russo's knowledge of the reward should be imputed to her to give her the requisite knowledge to effect the contract. This presupposes that Russo was acting as her attorney when he learned of the reward, a fact not established by the evidence. However, as a general rule, notice or knowledge of an attorney acquired during the time he is acting within the scope of his employment is

imputed to his client. (*Hess v. Conway,* 92 Kan. 787, 142 Pac. 253.) We have here determined that at the time Russo learned of the reward (July 26) the attorney-client relationship did not exist, although the influence from the relationship existing prior to that date continued.

Whatever might be said of imputed knowledge, Alexander is not in this case with "clean hands," and the right to claim a reward may be limited by equitable principles. (67 Am.Jur.2d, Rewards § 15 at 12.) She had no intention of going to the police because "she didn't know them that well," and her interests were more in realizing the fruits of the crime rather than in making any official disclosure of it. Even as we have determined that it would be unconscionable for Russo, an attorney, to recover under the circumstances revealed by this record, we deem it equally unconscionable for Alexander, whose knowledge of this crime and her son's part in it had existed for a matter of months, to be allowed to recover.

Accordingly, we hold that the judgment of the trial court be reversed and this case remanded with directions to enter judgment that neither Alexander nor Russo shall recover, but that the reward money paid into court, less court costs and the costs of this appeal, be refunded to the defendant Travelers Insurance Co. (See *Taft v. Hyatt,* supra.)