Terry ANDERSON, Appellant,

v.

**DOUGLAS & LOMASON COMPANY,**
Appellee.

No. 94–615.

Supreme Court of Iowa.

Nov. 22, 1995.

**280**

Richard B. Maher of Marks & Clare, Omaha, Nebraska, for appellant.

Helen C. Adams, Russell L. Samson, and David S. Steward of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

Defendant, Douglas & Lomason Company (DLC), discharged plaintiff, Terry Anderson, for taking a box of pencils. Anderson responded with a breach-of-contract action claiming DLC failed to follow progressive discipline policies contained in the employee handbook. The district court granted DLC's motion for summary judgment, which argued, in part, that the handbook did not constitute a contract. Anderson appealed.

■ Although we conclude progressive discipline policies meeting the requirements for a unilateral contract are enforceable, a disclaimer in the handbook given to Anderson prevented the policies from constituting a contract. Therefore, we affirm the district court's grant of summary judgment.

I. *Background Facts and Proceedings.*

On Anderson's first day of work at DLC he attended a six hour orientation session for new employees. He was informed that DLC had a progressive discipline policy and he was given a fifty-three page employee handbook which included these policies. Anderson read only the first few pages of the handbook; he admits he never read the provisions on progressive discipline.

DLC fired Anderson after three years of employment. His termination was based on an incident which occurred as he was leaving the plant one day. Company personnel stopped his pickup and asked to search it. Anderson gave permission and the workers found a box of company pencils. As a result, they also asked to search his home and garage. Anderson consented and a subsequent search revealed no company property. However, that same day, DLC asked Anderson to resign. He refused and was immediately fired.

Anderson responded by filing this breach-of-contract action against DLC. He claims DLC did not follow the progressive discipline policies outlined in its handbook for unauthorized possession of company property.[1] These progressive discipline policies require a written warning for the first offense, a three-day suspension without pay for the second offense, and discharge for the third offense. Because this was not Anderson's third offense, he claims DLC could not fire him.

DLC filed a motion for summary judgment claiming the handbook did not constitute a contract and therefore Anderson was employed at-will. First, DLC contended the handbook was never communicated to or accepted by Anderson because he did not read it. Second, DLC argued the handbook was

---

1. DLC asserts Anderson committed theft, for which the handbook permits immediate termination. Anderson however asserts he did not steal the pencils, but only possessed them to pass out to supervisors having a need for a writing instrument. This factual dispute would preclude summary judgment unless, viewing the facts most favorably to Anderson, i.e., assuming he was guilty only of unauthorized possession of company property, he had no enforceable right to progressive discipline for that offense. Because we conclude that even under the most favorable version of the facts Anderson has no breach-of-contract claim, summary judgment is appropriate despite the parties' disagreement on the nature of Anderson's misconduct. *See Farm & City Ins. Co. v. Anderson*, 509 N.W.2d 487, 491 (Iowa 1993).

not definite enough to constitute an offer. DLC cited two reasons for its vagueness claim: the handbook contains no written guarantees that discharge will occur only for cause or under certain conditions—the rules are mere guidance; and the manual contains a written disclaimer. The district court granted the employer's summary judgment motion without explanation in a calendar entry.

## II. *Scope of Review.*

We uphold summary judgment when the moving party shows no genuine issue of material fact exists and it is entitled to judgment as a matter of law. Iowa R.Civ.P. 237(c); *C–Thru Container Corp. v. Midland Mfg. Co.*, 533 N.W.2d 542, 544 (Iowa 1995). To decide if the moving party has met this burden, we review the record in the light most favorable to the party opposing summary judgment. *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 811 (Iowa 1994).

## III. *Indefinite Employment Contracts.*

The central issue presented by this dispute is whether DLC's issuance of a handbook created an employment contract.[2] This question arises because Iowa employment relationships are presumed to be at-will: In the absence of a valid employment contract either party may terminate the relationship without consequence. *See Hunter v. Board of Trustees,* 481 N.W.2d 510, 513 (Iowa 1992). Indeed, the doctrine of employment at-will is merely a gap-filler, a judicially created presumption utilized when parties to an employment contract are silent as to duration. *Butler v. Walker Power, Inc.,* 137 N.H. 432, 629 A.2d 91, 93 (1993); *see also Sorenson v. Kennecott–Utah Copper Corp.,* 873 P.2d 1141, 1145 (Utah App.1994) (at-will rule is mere rule of contract construction); Richard A. Epstein, *In Defense of the Contract at Will,* U.Chi.L.Rev. 947, 951 (1984) ("[at-will] rule of construction [is] in response to the peren-

nial question of gaps"). To understand our interpretation of employment contracts, particularly the nexus between the at-will doctrine and employee handbooks, we provide a brief overview.

A. *Development of employment at will.* The at-will presumption originated in English seasonal servant contract law. *See* Jay M. Feinman, *The Development of the Employment at Will Rule,* 20 Am.J.Legal Hist. 118, 118 (1976) (hereinafter "Feinman Article"). When parties remained silent as to the duration of service, the English courts filled the gap by presuming a certain duration and imposing a notice-of-termination requirement. 1 William Blackstone, *Commentaries on the Laws of England* 413 (U.Chi. Press 1979) ("If the hiring be general without any particular time limited, the law construes it to be a hiring for a year . . . . [Neither side can break the contract] without a quarter's warning.") (hereinafter "Blackstone"). The judicially created doctrine complemented statutes imposing a ban on leaving one's position or firing a worker before the end of the term and reflected the judiciary's concern for fairness between masters and seasonal servants. Feinman Article, 20 Am.J.Legal Hist. at 120; *see* Blackstone, at 413 (relationship continues "throughout all the revolutions of the respective seasons; as well as when there is work to be done, as when there is not").

The doctrine has never been static. As additional statutes were promulgated and the variety of employment situations far removed from the domestic environment increased, the English judiciary varied the amount of notice in accordance with the type of employment. Feinman Article, 20 Am.J.Legal Hist. at 121–22. "English law thus attempted to adapt to changing conditions and new situations . . . ." *Id.* at 121.

American courts relied heavily upon English precedent until the 1870s, when changing economic and social conditions prompted

---

**2.** Anderson also argues on appeal that DLC's motion for summary judgment was untimely because it was filed within forty-five days prior to trial. *See* Iowa R.Civ.P. 237(c) (motion for summary judgment must be filed not less than forty-five days prior to trial date). We believe the trial court has discretion to consider on its merits a summary judgment motion filed later than the deadline contained in rule 237(c). Therefore, the late filing of DLC's summary judgment motion does not provide a basis for reversal.

a dissolution of earlier law: the presumption of yearly hiring was seen as anachronistic and the concept of reasonable notice was disavowed. *Id.* at 125; *cf.* Richard J. Pratt, Comment, *Unilateral Modification of Employment Handbooks: Further Encroachments On the Employment–At–Will Doctrine,* 139 U.Pa.L.Rev. 197, 198–99 (1990) (hereinafter "Pratt Article"); Marla J. Weinstein, Comment, *The Limitations of Judicial Innovation: A Case Study of Wrongful Dismissal Litigation in Canada and the United States,* 14 Comp.Lab.L.J. 478 (1993) (comparing Canadian and American at-will jurisprudence; Canada retains the notice requirement). At this juncture, a new approach was suggested that changed the doctrine to a presumption of at-will employment:

> With us the rule is inflexible, that a general or indefinite hiring is *prima facie* a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof.... [I]t is an indefinite hiring and is determinable at the will of either party, and in this respect there is no distinction between domestic and other servants.

H.G. Wood, *A Treatise on the Law of Master & Servant* § 134, at 272 (1877). As the English presumption was a reflection of the economic and societal conditions in early Britain, Wood's rule was an outgrowth of prevailing American thought: ascendancy of freedom of contract, a reflection of the usual duration of employment contracts, and support for the development of advanced capitalism. Feinman Article, 20 Am.J.Legal Hist. at 130–31; *see also* Pratt Article, 139 U.Pa. L.Rev. at 199–201.

B. *Iowa jurisprudence.* Wood's version of employment at will quickly spread and was universally adopted. 1 Samuel Williston, *The Law of Contracts* § 39, at 61–62 (1920) (hereinafter "Williston"). Indeed, it is long established in Iowa case law. *Harrod v. Wineman,* 146 Iowa 718, 720, 125 N.W. 812, 813 (1910) ("it is held by an overwhelming weight of authority that a contract of indefinite employment may be abandoned at will by either party without incurring any liability"); *see also Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989); *Wolfe v.*

*Graether,* 389 N.W.2d 643, 652 (Iowa 1986); *Harper v. Cedar Rapids Television Co.,* 244 N.W.2d 782, 791 (Iowa 1976).

■ Despite the universal acceptance of the employment-at-will doctrine, legislatures and courts have restricted its application. For example, federal labor law gave rise to union contracts that include just cause discharge provisions. Michael J. Phillips, *Disclaimers of Wrongful Discharge Liability: Time for a Crackdown,* 70 Wash.U.L.Q. 1131, 1134 (1992). Similarly, public employees are protected from arbitrary dismissal under civil service statutes. *E.g., City of Des Moines v. Civil Serv. Comm'n,* 540 N.W.2d 52, 58 (Iowa 1995); Iowa Code § 400.18 (1995).

■ Reflecting the perceived need to protect employees from the harshness of the at-will doctrine, courts began to erode the doctrine with exceptions. Richard Harrison Winters, Note, *Employee Handbooks & Employment–At–Will Contracts,* 1985 Duke L.J. 196, 199; *cf.* Lawrence E. Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum.L.Rev. 1404 (1967). These exceptions generally fell within three categories: (1) discharges in violation of public policy, (2) discharges in violation of employee handbooks constituting a unilateral contract, and (3) discharges in violation of a covenant of good faith and fair dealing. Stephen F. Befort, *Employee Handbooks & the Legal Effect of Disclaimers,* 13 Indus.Rel.L.J. 326, 333–34 (1991/1992) (hereinafter "Befort Article"). However, Iowa's strong support of the at-will presumption is demonstrated by our reluctance to undermine the rule with exemptions. We have carved out only two narrow deviations: tort liability when a discharge is in clear violation of a "well-recognized and defined public policy of the State," *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 560 (Iowa 1988), and employee handbooks that meet the requirements for a unilateral contract, *French v. Foods, Inc.,* 495 N.W.2d 768, 769–71 (Iowa 1993). We have consistently rejected recognition of a covenant of good faith and fair dealing. *E.g., id.* at 771; *Fogel,* 446 N.W.2d at 456–57.

Our prior handbook decisions concerned only "for-cause" provisions. However, we

explicitly left room for future expansion: an employment handbook may guarantee an employee that discharge will occur "only for cause *or under certain conditions.*" *French,* 495 N.W.2d at 770; *accord Hunter,* 481 N.W.2d at 513; *Fogel,* 446 N.W.2d at 455. We now hold "or under certain conditions" to include progressive disciplinary procedures. Such provisions are enforceable if they are part of an employment contract. *Cf. Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 639 (Iowa 1990) ("We have recognized that written personnel policies providing terms *and procedures to be followed when discharging an employee* would be considered part of an at-will employee's employment contract.") (emphasis added); *Hamilton v. First Baptist Elderly Hous. Found.,* 436 N.W.2d 336, 340–41 (Iowa 1989) (considering whether personnel policies are part of the employment contract). We must now determine whether Anderson's handbook constitutes an enforceable contract. If it does not, we presume the parties intended a contract at will.

■■■ C. *Unilateral contract approach.* When considering whether a handbook creates a contract we utilize unilateral contract theory. *McBride v. City of Sioux City,* 444 N.W.2d 85, 90–91 (Iowa 1989). A unilateral contract consists of an offeror making a promise and an offeree rendering some performance as acceptance. *See Hunter,* 481 N.W.2d at 513; *see also* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.4, at 165 (1990) (hereinafter "Farnsworth"). An employee handbook is a unilateral contract when three elements are present: (1) the handbook is sufficiently definite in its terms to create an *offer;* (2) the handbook is communicated to and accepted by the employee so as to constitute *acceptance;* and (3) the employee provides *consideration.*[3] *McBride,* 444 N.W.2d at 91.

■■■ As with any contract, the party who seeks recovery on the basis of a unilateral contract has the burden to prove the existence of a contract. *Hawkeye Land Co. v. Iowa Power & Light Co.,* 497 N.W.2d 480, 486 (Iowa App.1993). Therefore, Anderson has the burden to prove DLC's handbook created an enforceable contract. We begin our analysis with a discussion of the communication aspect of the acceptance element of Anderson's claim.

III. *Was the Employee Manual Communicated Even Though Anderson Never Read the Progressive Discipline Policies Upon Which He Now Relies?*

■■■ Anderson read only a few pages of the employee manual; he did not read the provisions on progressive discipline. DLC contends that under these circumstances, there can be no acceptance. We disagree. DLC distributed its employee handbook to new employees. We think Anderson's receipt of the handbook is sufficient communication.[4]

■■■ A. *Traditional analysis: offeree must know of offer.* Under traditional contract analysis, an offer is not effective until it reaches the offeree. Farnsworth, § 3.10, at 212; Restatement (Second) of Contracts § 51, cmt. a (1981) ("it is ordinarily essential to the acceptance of the offer that the offeree know of the proposal made"); *cf. Iowa Malleable Iron Co. v. Iowa Employment Sec. Comm'n,* 195 N.W.2d 714, 718 (Iowa 1972) ("one cannot be deemed to have declined an offer never communicated to him"). The reason for the rule is clear: The offeree must know of the offer before there can be mutual assent. *Caldwell v. Cline,* 109 W.Va. 553, 554, 156 S.E. 55, 56 (1930); Farnsworth, § 3.10, at 212 ("This requirement has been reinforced by the insistence of the bargain

---

**3.** As DLC does not claim a lack of consideration for its handbook, we do not address the validity of Anderson's consideration. *See Hubbard Milling Co. v. Citizens State Bank,* 385 N.W.2d 255, 258 (Iowa 1986) (we ascertain whether any consideration was provided only where defense of lack of consideration is raised by parties).

**4.** The fact that the handbook was distributed to all employees and received by Anderson distinguishes this case from *McBride* where we found no communication. In *McBride,* the handbook was distributed to department heads, not all employees, and was not even received by the employee seeking to rely on the provisions in the handbook. *McBride,* 444 N.W.2d at 91.

theory of consideration that the acceptance be made in response to the offer.").

The most common illustration of the application of this rule is the general offer of a reward. John P. Dawson et al., *Cases & Comment on Contracts* 360 (5th ed. 1987). The reward-giver, or offeror, bargains for performance, not a reciprocal promise; sometimes the performance is rendered without knowledge of the offer. Some courts resolve this issue using the traditional law of contracts:

> there can be no contract unless the claimant when giving the desired information knew of the offer of the reward and acted with the intention of accepting such offer; otherwise the claimant gives the information not in the expectation of receiving a reward but rather out of a sense of public duty or other motive unconnected with the reward.

*Glover v. Jewish War Veterans*, 68 A.2d 233, 234 (D.C.1949); *see also Gadsden Times v. Doe*, 345 So.2d 1361, 1363–64 (Ala.Civ.App. 1977); *Slattery v. Wells Fargo Armored Serv. Corp.*, 366 So.2d 157, 159 (Fla.Dist.App. 1979); *Alexander v. Russo*, 1 Kan.App.2d 546, 571 P.2d 350, 358 (1977); *Braun v. Northeast Stations & Servs., Inc.*, 93 A.D.2d 994, 461 N.Y.S.2d 623, 624 (1983). Courts adopting this traditional approach do so because " 'it is impossible for an offeree actually to assent to an offer unless he knows of its existence.' " *Glover*, 68 A.2d at 234 (quoting Williston, § 33, at 47). On the other hand, one authority has suggested knowledge of a reward-offer need not be a prerequisite to acceptance:

> It is probable, indeed, that the chief reason for enforcing a promise is that it has induced the promisee to act in reliance upon it. One who has rendered a service without knowledge of an offered promise has not so acted. But the chief reason is not necessarily the only reason for enforcing a promise. If it seems fair to the courts to

enforce a promise when the promisor has received the desired equivalent, even though the one rendering it knew nothing of the promise and rendered the service from other motives, there is no sufficient reason for refusing to call that enforceable promise a contract.

1 Joseph M. Perillo, *Corbin on Contracts* § 3.5, at 328 (rev. ed. 1993).

■ Iowa case law on rewards has not addressed this issue. However, we have adopted the traditional position with respect to unilateral contracts in general, that the offeree's performance "must have been induced by the promise made." *St. Peter v. Pioneer Theatre Corp.*, 227 Iowa 1391, 1401, 291 N.W. 164, 169 (1940). Nevertheless, for reasons that follow, we decline to follow the traditional requirement that knowledge of the offer is a prerequisite to acceptance *in the limited context of employee handbook cases.*

B. *Employee handbooks: alteration of traditional rule.* Although we apply the traditional requirement of communication in ordinary contexts, an employment contract based upon an employee handbook "does not always follow the traditional model." Mark Pettit, Jr., *Modern Unilateral Contracts*, 63 B.U.L.Rev. 551, 583 (1983). We believe important policies, which are confined to employee handbook cases, dictate a narrow divergence.

Where a contract is based upon an employee handbook distributed to all employees, the contract is not an individually negotiated agreement; it is a standardized agreement between the employer and a class of employees. *Id.* We analogize to the interpretation of standardized contracts: "A standardized agreement 'is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.' " [5] *Kinoshita v. Canadian P. Airlines, Ltd.*, 68 Haw. 594, 724 P.2d 110, 116–17

---

5. By analogizing to standardized contracts for the limited purpose of examining the scope of the communication requirement, we do not imply that any other rule developed for the interpretation of standardized contracts applies to employee-handbook unilateral contracts. Employee handbook cases arise in a unique setting that

implicates policies and concerns not entirely similar to the typical standardized agreement situation. *See* Michael A. Chagares, *Utilization of the Disclaimer as an Effective Means to Define the Employment Relationship*, 17 Hofstra L.Rev. 365, 379 (1989) (hereinafter "Chagares Article").

(1986) (quoting Restatement (Second) of Contracts § 211(2) (1981)).

Therefore, we hold it unnecessary that the particular employee seeking to enforce a promise made in an employee manual have knowledge of the promise. Although this holding is a departure from traditional 'bargain-theory' contract analysis, we think it produces "the salutary result that all employees, those who read the handbook and those who did not, are treated alike." E. Allan Farnsworth, *Developments in Contract Law During the 1980's: The Top Ten,* 41 Case W.Res.L.Rev. 203, 209 (1990). Moreover, our deviation from traditional contract theory is consistent with the spirit of the judicially created at-will presumption: It is a common law presumption created in response to statutory and societal demands.

■ Our decision also finds support in other jurisdictions. *E.g., Kinoshita,* 724 P.2d at 117 ("the plaintiffs' right to compel the company to live up to its promises does not turn on whether they received all of the communications addressed to the employees or not"); *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880, 892 (1980) ("nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices"); *Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257, 1268 n. 10 (1985), *modified,* 101 N.J. 10, 499 A.2d 515 (1988) ("If reliance is not presumed, a strict contractual analysis might protect the rights of some employees and not the others.... [E]mployees neither had to read [the manual], know of its existence, or rely on it to benefit from its provisions any more than employees in a plant that is unionized have to read or rely on a collective-bargaining agreement in order to obtain its benefits."). Thus, the fact that Anderson did not read the employee manual does not prevent him from relying on the promises contained in the manual in this breach-of-contract action.[6]

6. We do not separately discuss the issue of whether Anderson's continued work constituted an acceptance of DLC's offer because neither

IV. *Did the Handbook's Progressive Discipline Procedures Constitute an Offer?*

■ We now consider whether DLC's handbook constituted an offer to Anderson to utilize progressive disciplinary procedures. We believe this aspect of the analysis should be conducted according to traditional contract theory.

■ A. *Offer.* All contracts must contain mutual assent; mode of assent is termed offer and acceptance. *Kristerin Dev. Co. v. Granson Inv.,* 394 N.W.2d 325, 330 (Iowa 1986); Restatement (Second) of Contracts § 22 (1981); *see also Service Employees Int'l Local No. 55 v. Cedar Rapids Community Sch. Dist.,* 222 N.W.2d 403, 408 (Iowa 1974). An offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981); *accord* Farnsworth, § 3.10, at 210 (offer is "a promise that is conditional on a manifestation of assent in the form of some action by the offeree and that confers upon the offeree the right to create a contract by taking that action").

■ We look for the existence of an offer objectively—not subjectively. *Cf. LaFontaine v. Developers & Builders, Inc.,* 261 Iowa 1177, 1183, 156 N.W.2d 651, 655 (1968) (existence of contract determined from words and circumstances). Judge Learned Hand explained this rule:

A contract has, strictly speaking, nothing to do with the personal, or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held....

party raises that issue beyond the question of communication.

*Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat'l Bank,* 201 F. 664 (2d Cir.1912), *aff'd sub nom. National City Bank v. Hotchkiss,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 *and aff'd sub nom. Mechanics' & Metals Nat'l Bank v. Ernst,* 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121 (1913); *see also Embry v. Hargadine, McKittrick Dry Goods Co.,* 127 Mo.App. 383, 105 S.W. 777, 778 (1907) ("In so far as their intention is an influential element, it is only such intention as the words or acts of the parties indicate."). "The standard is what a normally constituted person would have understood [the words] to mean, when used in their actual setting." *New York Trust Co. v. Island Oil & Transp. Corp.,* 34 F.2d 655, 656 (2d Cir.1929) (Hand, J.); *cf. Deitrick v. Sinnott,* 189 Iowa 1002, 1010, 179 N.W. 424, 428 (1920) (cannot avoid contract because merely jesting if conduct and words were such as to warrant a reasonable person in believing that he was in earnest). We adopt the following analysis: "The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.,* 58 F.3d 1227, 1229 (7th Cir.1995).

▬ When objectively examining the handbook to determine intent to create an offer, we look for terms with precise meaning that provide certainty of performance. *Cf. Gildea v. Kapenis,* 402 N.W.2d 457, 459 (Iowa App.1987). This is a definiteness inquiry: if an offer is indefinite there is no intent to be bound. *See Architectural Metal Sys., Inc.,* 58 F.3d at 1229 ("A lack of essential detail would negate such a belief, since the sender could not reasonably be expected to empower the recipient to bind him to a contract of unknown terms.... [T]he recipient of a hopelessly vague offer should know that it was not intended to be an offer that could be made legally enforceable by being accepted.").

▬ B. *DLC's handbook is too vague to constitute an offer.* Here the issue is how a reasonable employee would construe DLC's handbook—a promise of progressive disciplinary procedures or mere guidance? The question resolves to whether the handbook's text was sufficiently definite to constitute an offer to apply certain procedures for discharge. *See Falczynski v. Amoco Oil Co.,* 533 N.W.2d 226, 235 (Iowa 1995). That is a question of law. *French,* 495 N.W.2d at 770; *Fogel,* 446 N.W.2d at 456.

DLC asserts the handbook was not definite enough to constitute an offer for two reasons: It claims there are no guarantees that the company will always follow the progressive discipline procedures, and the handbook includes a written disclaimer that expressly states there is no intent to create a contract. Therefore, DLC contends no offer existed for Anderson to accept.

▬ 1. *Handbook language.* When considering whether a handbook is objectively definite to create a contract we consider its language and context. Our analysis of case law reveals three factors to guide this highly fact-intensive inquiry: (1) Is the handbook in general and the progressive disciplinary procedures in particular mere guidelines or a statement of policy, or are they directives? *See Boulay v. Impell Corp.,* 939 F.2d 480, 482 (7th Cir.1991) (language that was suggestive rather than mandatory lead to conclusion of no promise); *Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661, 662 (Mo.1988) (en banc) ("The handbook was merely an informational statement of McDonnell's self-imposed policies"); (2) Is the language of the disciplinary procedures detailed and definite or general and vague? *See Hunt v. I.B.M. Mid America Employees Fed. Credit Union,* 384 N.W.2d 853, 856–58 (Minn.1986) (vague language fails to provide any detailed or definite disciplinary procedure); *Mecurio v. Therm–O–Disc, Inc.,* 92 Ohio App.3d 131, 634 N.E.2d 633, 637 (Ohio App.), *overruled on other grounds,* 68 Ohio St.3d 1410, 623 N.E.2d 566 (1993) ("From the plain terms of the [progressive discipline] policy ... reasonable minds could conclude that an implied contract was created."); and (3) Does the employer have the power to alter the procedures at will or are they invariable? *See McDonnell Douglas Corp.,* 745 S.W.2d at 662 (handbook "provided that the rules were subject to change at any time"; thus, there was no contract); *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199,

511 A.2d 830, 838–39 (1986) (because employer could alter plan at will, no contract). We ask these questions to determine whether an employee is reasonably justified in understanding a commitment has been made. *See Bolling v. Clevepak Corp.*, 20 Ohio App.3d 113, 20 O.B.R. 146, 484 N.E.2d 1367, 1373 (1984).

Here, the text of the disciplinary procedures contains language of command: "The following action is prohibited, and the penalties for violation of these Shop Rules *shall* be as follows [progressive discipline steps are then listed]." (Emphasis added.) However, the introduction to the section of the handbook containing the disciplinary procedures states twice that the rules "have been designed for the *information and guidance* of all employees." (Emphasis added.) Second, the procedures themselves are fairly specific. There are four categories that describe in detail the offenses included in each category. In addition, the discipline for each category is also specific: for unauthorized possession of company property, the first offense requires a written warning, the second offense a three day unpaid suspension and the third offense results in discharge. Finally, DLC retained the power to alter the procedures at will. We need not decide whether these factors alone result in a sufficiently definite offer, however, because we must also consider the effect of DLC's disclaimer. *See Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991) ("procedures in the handbook for terminating an employee must be read in light of the language in the disclaimer which clearly reserved the right to discharge for any reason").

2. *Handbook disclaimer.* A disclaimer can prevent the formation of a contract by clarifying the intent of the employer not to make an offer. Befort Article, 13 Indus.Rel.L.J. at 349; Chagares Article, 17 Hofstra L.Rev. at 378. "In the context of employee handbooks, the essential purpose of a disclaimer is to claim at-will status for the employment relationship by repudiating or denying liability for statements expressed in the handbook." Befort Article, 13 Indus.Rel.L.J. at 349. Although in theory disclaimers protect employers, many courts have imposed requirements that make it more difficult to give effect to them. *Id.*

For example, many jurisdictions require the disclaimer be "clear and conspicuous" to be enforceable and negate any contractual relationship between an employer and employee. Chagares Article, 17 Hofstra L.Rev. at 380; *see, e.g., Mace v. Charleston Area Medical Ctr. Found., Inc.*, 188 W.Va. 57, 63, 422 S.E.2d 624, 630 (1992) ("employee handbook which contains a clear and conspicuous disclaimer of job security will preserve the at-will status"). While we have never considered whether a disclaimer in an employee handbook must be clear and conspicuous, our court of appeals has implicitly endorsed a conspicuous requirement by holding a disclaimer "[p]rominently displayed in the first page" of a handbook prevented the formation of a contract. *Palmer v. Women's Christian Ass'n*, 485 N.W.2d 93, 95–96 (Iowa App.1992).

The requirement that a disclaimer be conspicuous has given rise to much litigation. Compare cases holding disclaimer clear and conspicuous, *Hein v. Kerr–McGee Coal Corp.*, 809 F.Supp. 84, 86–87 (D.Wyo.1990), *aff'd*, 956 F.2d 278 (10th Cir.1992) (disclaimer at beginning of handbook under heading "INTRODUCTION" which was one of two paragraphs on page, both of which were surrounded by open space); *Chambers v. Valley Nat'l Bank*, 721 F.Supp. 1128, 1131 (D.Ariz. 1988) (disclaimer prominently displayed in bold print in introductory paragraph); *Nettles v. Techplan Corp.*, 704 F.Supp. 95, 98 (D.S.C.1988) (disclaimer of same type and color contained in separate paragraph on first page of manual); *Butler v. Westinghouse Elec. Corp.*, 690 F.Supp. 424, 429 (D.Md.1987) (disclaimer in bold print at front of handbook); *Investors Premium Corp. v. Burroughs Corp.*, 389 F.Supp. 39, 45 (D.S.C. 1974) (clause set out in separate paragraph in capital letters); *Hanson v. New Technology, Inc.*, 594 So.2d 96, 99 (Ala.1992) (language found on first page of handbook); *Chesnick v. Saint Mary of Nazareth Hosp.*, 211 Ill. App.3d 593, 156 Ill.Dec. 69, 71, 570 N.E.2d 545, 547 (1991) (disclaimer on separate page signed by plaintiff); *Eldridge v. Evangelical Lutheran Good Samaritan Soc'y*, 417

N.W.2d 797, 800 (N.D.1987) (explicit disclaimer in closing statement located directly above signature of employee) with cases holding disclaimer not clear and conspicuous, *Durtsche v. American Colloid Co.,* 958 F.2d 1007, 1010 (10th Cir.1992) (disclaimer buried in glossary definition and no effort to highlight existence or effect of disclaimer); *Jimenez v. Colorado Interstate Gas Co.,* 690 F.Supp. 977, 980 (D.Wyo.1988) (disclaimer not set off in any way to attract attention, was placed under heading "GENERAL INSTRUCTIONS" and subheading "CONTENTS," was indistinct in print and type and had no border setting it apart from any other paragraph on page); *Hicks v. Methodist Medical Ctr.,* 229 Ill.App.3d 610, 170 Ill. Dec. 577, 579–80, 593 N.E.2d 119, 121–22 (1992) (disclaimer located on page thirty-eight of thirty-nine page manual; not highlighted, printed in capital letters nor in any way prominently displayed; was not entitled "Disclaimer," but was located in section headed "Revisions"); *Kumpf v. United Tel. Co.,* 311 S.C. 533, 429 S.E.2d 869, 872 (App. 1993) (disclaimer located in "conclusion" section of handbook and not capitalized, in bold type, set apart with distinctive border nor in contrasting type or color). While the factual nature of the definiteness inquiry is partially to blame, too often such litigation is the product of illusory judicial standards. *See Sanchez v. Life Care Ctrs. of Am., Inc.,* 855 P.2d 1256, 1260 (Wyo.1993) ("This is yet another case to come before us in which an employer has tried to satisfy the court's secret concept of an adequate disclaimer in an employee handbook.") (Cardine, J., dissenting).

◼ We think such uncertainty is unnecessary. A disclaimer should be considered in the same manner as any other language in the handbook to ascertain its impact on our search for the employer's intent. Therefore, we reject any special requirements for disclaimers; we simply examine the language and context of the disclaimer to decide whether a reasonable employee, reading the disclaimer, would understand it to mean that the employer has not assented to be bound by the handbook's provisions. *Cf. Bolling,* 484 N.E.2d at 1373 ("the employees ... must be justified 'in understanding that a commitment has been made.'") (citations omitted); *Payne v. Sunnyside Community Hosp.,* 78 Wash.App. 34, 894 P.2d 1379, 1384 (1995) ("crucial question is whether the employee has a reasonable expectation the employer will follow the discipline procedure, based upon the language used").

◼ Similar to our consideration of handbook language in general, we believe two factors guide our inquiry. First, is the disclaimer clear in its terms: does the disclaimer state that the handbook does not create any rights, or does not alter the at-will employment status? Second, is the coverage of the disclaimer unambiguous: what is the scope of its applicability? Here the disclaimer appears on page fifty-three, the last page of the handbook, two inches below the preceding paragraph:

This Employee Handbook is not intended to create any contractual rights in favor of you or the Company. The Company reserves the right to change the terms of this handbook at any time.

◼ When examining the disclaimer we first consider the text employed. In no uncertain terms DLC's disclaimer states the handbook "is not intended to create *any* contractual rights." (Emphasis added.) *See Smoot v. Boise Cascade Corp.,* 942 F.2d 1408, 1411 (9th Cir.1991) ("the written materials also contain explicit disclaimers that preclude their forming the basis of an employment agreement"); *Shapiro v. Wells Fargo Realty Advisors,* 152 Cal.App.3d 467, 199 Cal.Rptr. 613, 616 (1984) (agreement stated that it did not confer a right to continued employment); *Tilbert v. Eagle Lock Co.,* 116 Conn. 357, 165 A. 205, 207 (1933) (death benefit plan said "it constitutes no contract with any Employee or any beneficiary, and confers no legal rights on" any party). We believe DLC's disclaimer is clear in its disavowal of any intent to create a contract.

Second, we examine the scope of the disclaimer. There is nothing about the location of DLC's disclaimer or the language used to suggest that the disclaimer does not apply to the progressive discipline policies. The disclaimer is found in the handbook itself and

unequivocally applies to the entire employee handbook.

 We think a reasonable person reading the handbook could not believe that DLC has assented to be bound to the provisions contained in the manual. *See Smoot,* 942 F.2d at 1411 (finding employment at will as a matter of law: "Although [employer's] termination policies contain promises of specific treatment in specific situations, the written materials also contain explicit disclaimers that preclude their forming the basis of an employment agreement."). Thus, we hold DLC's handbook is not sufficiently definite to constitute a valid offer.

## VI. *Summary.*

We hold as a matter of law no contract existed between Anderson and DLC. Anderson was employed at-will. Therefore, the trial court correctly granted summary judgment to DLC.

**AFFIRMED.**