**John KARTHEISER, Plaintiff,**

v.

**AMERICAN NATIONAL CAN COMPANY, Defendant.**

No. 4–98–CV–90339.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 3, 1999.

Pamela J. Prager, Des Moines, IA, for Plaintiff.

Thomas W. Foley, Kathryn Atkinson Overberg, Des Moines, IA, for Defendant.

## ORDER RE: MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

Now before the Court is Defendant American National Can Company's ("American Can") Motion for Summary Judgment of Plaintiff John Kartheiser's ("Kartheiser") action alleging breach of an agreement to pay him overtime and violation of the Iowa Wage Payment Collection Act. Plaintiff resisted the Motion and Defendant filed a reply brief; the matter is considered fully submitted. This case, before the Court on diversity jurisdiction, is controlled by Iowa law. *See Frideres v. Schiltz,* 113 F.3d 897, 898 (8th Cir.1997).

## I. Statement of Facts [1]

Kartheiser was employed by Defendant American Can beginning on September 12, 1985. He commenced his employment for Defendant as a Maintenance Mechanic. His duties in that position included repairing equipment and general maintenance, and he was paid an hourly wage. In 1987, he was promoted to Maintenance Foreman and began to directly supervise a crew of hourly employees. For this reason, he was eligible to receive, and did receive, additional compensation for certain overtime hours he worked. He received overtime compensation as provided for in the Engineering Office Manual's overtime policy, which provides that employees who are classified as exempt under the Fair Labor Standards Act may receive overtime under certain conditions if they directly supervise hourly employees.

On October 15, 1990, Kartheiser was promoted again, this time to the position of Supervisor of the Maintenance Department at American Can's Des Moines plant. The promotion included a 9% salary increase and a pay grade increase from 36 to 39. Kartheiser later became eligible for a bonus program, which earned him additional income. This position did not require Kartheiser to supervise any hourly employees.

On November 1, 1993, American Can instituted a mass discharge at the Des Moines facility, terminating, among others, all its foremen, including maintenance foremen. Kartheiser had supervised the maintenance foremen until this time. The mass discharge was part of a plan to institute a new "team concept," whereby foremen would not be necessary and employees would make more decisions on their own, with only minimal supervision. After the layoff, however, Kartheiser again became responsible for the supervision of hourly employees, directly supervising hourly maintenance crews and machinists. Neither Kartheiser nor any other depart-

---

**1.** The facts provided are viewed in the light most favorable to the nonmoving party. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell* *Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994).

ment supervisor in the Des Moines plant who lost foremen regularly received overtime compensation after 1993. However, American Can at certain times paid overtime to other individuals who held positions similar to Kartheiser. These included Fred Tiernan, Extrusion Department Supervisor at the Des Moines facility, and Emil Bagulki, Maintenance Department Supervisor at the Neenah, Wisconsin plant. Tiernan, however, only received overtime after demanding it in return for extra work in 1996.

At some point after the November 1, 1993 mass layoff, Kartheiser spoke with Plant Manager Dave Kowalski or Engineering Manager Steve Jonjak to request that he be paid overtime. In April or May, 1994 and thereafter, American Can informed Kartheiser he was not eligible for overtime compensation as a Department supervisor. In part because of this dispute regarding overtime pay, Kartheiser resigned his position with American Can on August 2, 1996.

American Can maintained at least three different policy manuals at its Des Moines plant during Kartheiser's employment. The first, known as the Human Resources Standard Practice Manual ("H.R.Manual"),

is maintained by American Can in the Human Resources Office. At page 1, the H.R. Manual states that:

> The employment of all employees covered by these policies is not pursuant to any contract (either written or oral, express or implied), and is not for any set period or upon any set conditions, and is terminable at any time for any reason. Any Company manuals, handbooks, or other personnel-related material which employees or supervisory personnel may receive, such as this manual, are for information purposes only.

Kartheiser never received a copy of the H.R. Manual or this disclaimer, nor was he ever aware that the manual existed. Although maintained in the human resources office, the H.R. Manual was never distributed to Kartheiser or other employees.

A second policy manual, the Engineering Office Manual, was a compilation of various policies and procedures that American Can had adopted over the years. At least one copy of this manual was maintained in the Engineering Office where Kartheiser worked. This manual was made available for Kartheiser's use, and contained the overtime policy at issue in this action.[2] As Maintenance Department

---

**2.** The overtime policy provides, in relevant part, as follows:

EXEMPT EMPLOYEE OVERTIME PROGRAM
FLEXIBLE PACKAGING MANUFACTURING
REVISED JANUARY 1, 1983

A. PURPOSE: To provide additional compensation to eligible exempt supervisory personnel who are required to work scheduled daily or weekend overtime hours.

B. BASIC POLICY:
1. Base salaries will recognize the proper payment relationship between exempt supervisors and hourly rate employees and the normal amount of overtime work inherent in any exempt supervisory position.
2. When business commitments require scheduled work beyond this normal amount, eligible employees will receive supplemental compensation, in addition to base salary, in accordance with this Program.

C. ELIGIBILITY
1. Exempt employees with responsibility for the direct supervision of hourly employees are the only employees eligible to receive payment under this program. Such positions include shift supervisors, mechanical foreman, supervisor of inspection, etc.
2. There will be no exceptions to the above.

D. TYPE OF WORK COVERED:
1. The Program is intended to pay for scheduled work beyond the normal daily or weekly schedule. The key word is "scheduled". This means that the Plant Manager (or equivalent) will have approved the work in advance.
2. Bona fide emergencies requiring substantial additional hours, and which cannot be anticipated, may also be included when retroactively approved by the Plant Manger [sic].
. . .

F. PAYMENT FORMULA (no change):
Overtime payments under this Program will be made to eligible employees on the following basis:
1. Six and seven Day Work Weeks
 a. For scheduled work performed on Saturday, an additional payment of 15% of weekly base salary for each four-hour period to a maximum of eight hours.
 b. For scheduled work performed on Sunday, an additional payment of 20% of weekly

Supervisor, Kartheiser oversaw payment of employees under the overtime policy. The Engineering Office Manual does not contain a disclaimer. At some point, a third manual, known as the "Flexible Packaging Policies and Procedures Manual," was distributed to employees, including Kartheiser. This manual contains neither a disclaimer nor a policy regarding overtime premium pay.

## II. Summary Judgment Standard

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda General Hospital*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried," *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). The Court does not weigh the evidence nor make credibility determinations; rather the Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

The moving party bears the initial burden of demonstrating the absence of a

---

base salary for each four-hour period to a maximum of eight hours.
. . .
2. Daily Overtime:
Scheduled overtime occurring during the normal five day week will be paid on the following basis:
 a. Upon the attainment of 50 scheduled hours—30% of weekly base salary.
 b. Upon the attainment of 54 scheduled hours—45% of weekly base salary.
 c. Upon the attainment of 58 scheduled hours—60% of weekly base salary.
 d. An additional 15% will be paid for each additional four-hour increment.
. . .

H. REPORTING AND APPROVALS:
1. Each Plant Manager (or equivalent) or his authorized designate will be responsible for maintaining internally a complete record of scheduled overtime hours worked by each exempt employee eligible for this Program.
2. At the conclusion of each pay period, plants will prepare Form 7534, Overtime Payment Report (exempt only) including an entry for each eligible employee who is entitled to payment.
3. Form 7534 requires approval of the V.P. Manufacturing, prior to payment. Normal routing will be from Plant Manager to the V.P. Manufacturing, and then to the appropriate payroll center. . . .

genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. See *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505.

### III. Analysis

Kartheiser claims in this suit that the overtime policy contained in the Engineering Office Manual constituted an enforceable contract between American Can and himself. American Can, on the other hand, claims in its Motion for Summary Judgment that the policy is not an enforceable contract. American Can further claims that a disclaimer contained in its H.R. Manual prevented the Engineering Office Manual overtime policy from becoming an enforceable contract. In evaluating whether the Engineering Office Manual overtime policy and the H.R. Manual disclaimer are binding on American Can and Kartheiser, this Court follows the Iowa courts in applying the theory of unilateral contract.

### A. Whether the Overtime Policy Establishes an Enforceable Contract

■ Kartheiser claims that American Can's Engineering Department Manual established a contract that he would be compensated for overtime work. To establish a contract under Iowa law, a handbook or manual must meet the requirements for a unilateral contract. *Thompson v. City of Des Moines,* 564 N.W.2d 839, 844 (Iowa 1997); *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 283 (Iowa 1995);

*Hunter v. Board of Trustees,* 481 N.W.2d 510, 513 (Iowa 1992); *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 456 (Iowa 1989). An employee handbook may create a unilateral contract if: (1) the handbook is sufficiently definite in its terms to create an offer; (2) the handbook has been communicated to and accepted by the employee so as to constitute acceptance; and (3) the employee continues working, to provide consideration. *Anderson,* 540 N.W.2d at 283; *McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989).

■ The law of unilateral contracts is not limited to contracts for continued employment. Under Iowa law, a unilateral contract exists wherever an offeror makes a promise and an offeree renders some performance as acceptance. *See, e.g., Magnusson Agency v. Public Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 25 (Iowa 1997); E. Farnsworth, *Contracts,* § 312, at 223 (1990) (when an offeror seeks performance and not a return promise as the desired mode of assent, the result is a unilateral contract). This Court has not encountered any Iowa cases stating that the theory is inapplicable to contracts for employment matters other than continued employment. Under the unilateral contract theory, the party claiming the contract carries the burden to prove its existence. *Thompson,* 564 N.W.2d at 844; *Anderson,* 540 N.W.2d at 283.

### 1. Whether the Overtime Policy is Sufficiently Definite in its Terms to Constitute an Offer

■ Under the unilateral contract analysis, the Court must first determine whether the overtime policy contained in the Engineering Office Manual was sufficiently definite in its terms so as to create an offer. *Anderson,* 540 N.W.2d at 283; *McBride,* 444 N.W.2d at 91. In *Anderson* and *Jones v. Lake Park Care Center, Inc.,* 569 N.W.2d 369 (Iowa 1997), the Iowa Supreme Court set out guidelines to be used in assessing whether a policy is clear and definite such that it establishes a con-

tract offer. *Anderson* and *Jones* stated that the following factors should be examined: a) whether the policy is a mere guideline or a directive; b) whether the language of the policy is detailed and definite or general and vague; and c) whether the employer has the power to alter the procedures at will or whether they are invariable. *Anderson,* 540 N.W.2d at 286–87; *Jones,* 569 N.W.2d at 375. These questions are asked to determine whether an employee is reasonably justified in understanding a commitment has been made. *Anderson,* 540 N.W.2d at 287 (citation omitted).

In confronting the first question, the overtime policy specifically provides that "eligible employees will receive supplemental compensation, in addition to base salary." The policy also sets out who is eligible for overtime, under what circumstances and at what levels, and reporting and approval requirements. Additionally, there is no language placing compliance with the policy at the discretion of the employer, or indicating that the employer has the power to alter it at will. *Cf. Thompson,* 564 N.W.2d at 845 ("The textual language is largely discretionary ('may'), not directory ('shall' or 'must'). This limited use of 'language of command' refutes [the plaintiff's] claim that the procedures outlined were intended to contractually bind the [employer]"). The Court therefore holds that this language meets the requirements set out in *Anderson* and *Jones,* and thus establishes an offer. *See Anderson* 540 N.W.2d at 286–87; *Jones,* 569 N.W.2d at 375; *Cannon v. Nat'l By-Prods., Inc.,* 422 N.W.2d 638, 640–41 (Iowa 1988); *Hunter,* 481 N.W.2d at 515–16.

This finding conforms with Iowa law, despite American Can's claims that no contract was intended. The question of whether written personnel policies became a part of Kartheiser's employment contract is to be determined on the basis of

his reasonable expectation, even if it was not the employer's intention that the policies confer contractual rights. *See* Iowa Code § 622.22; *Cannon,* 422 N.W.2d at 640. Viewing the facts in the light most favorable to Kartheiser, the terms of the overtime policy gave him a reasonable expectation that his duties from November 1, 1993 forward were subject to the terms of the overtime policy.[3]

The issue of reasonable expectation was also raised by American Can's factual claim, not disputed by Kartheiser, that in April or May of 1994, the company informed Kartheiser that he would not be entitled to overtime compensation. American Can claims that any reasonable expectation Kartheiser had of entitlement to overtime compensation ended at the point when it informed him of its intent. Underlying the company's claim is the fact that under Iowa law, contracts can be orally modified by a statement such as the company's at that time. *See, e.g., Humiston Grain Co. v. Rowley Interstate Transp. Co., Inc.,* 483 N.W.2d 832, 834 (Iowa 1992). American Can's position finds support in the dictate of Iowa law that an employment contract terminable at will is subject to modification at any time by either party as a condition of its continuance. *Dallenbach v. MAPCO Gas Products, Inc.,* 459 N.W.2d 483, 487 (Iowa 1990); *Moody v. Bogue,* 310 N.W.2d 655, 660–61 (Iowa App. 1981); *see also Janda v. Iowa Indus. Hydraulics, Inc.,* 326 N.W.2d 339, 341 (Iowa 1982). In such a case, an employee's decision to continue work after an announced change in the terms of employment is an acceptance of the new terms as a matter of law. *Dallenbach,* 459 N.W.2d at 487; *Moody,* 310 N.W.2d at 661; *Janda,* 326 N.W.2d at 341. Depending on the circumstances, such an act may affect the reasonableness of Kartheiser's belief that he was covered by the overtime policy. Kartheiser's position, on the other hand, is that any

---

**3.** The question of whether application of the policy actually entitled Kartheiser to additional compensation has not been raised by Defendant's Motion for Summary Judgment, although the parties have hinted at it in their arguments. The Court does not consider the issue here.

communication to him that he would not be paid overtime was a breach of the policy. *See Williams v. Clark*, 417 N.W.2d 247, 250 (Iowa App.1987) (definite and unequivocal repudiation of contract can constitute anticipatory breach).

The language used by Engineering Manager Steve Jonjak to set out the company's position in April or May of 1994 was to the effect that the company "was not going to pay overtime to the position [Kartheiser] was filling." Kartheiser Dep. 53–54. Jonjak had talked to Kowalski, who relayed to him that "Monica [Rottman in the American Can hierarchy in Chicago] had said that [the company] [was not] willing to start paying department supervisors [overtime compensation]." *Id.* at 19. The conversation came after an exchange between Kartheiser and Kowalsld regarding Kartheiser's work hours and the fact that Kartheiser felt his pay had decreased.

American Can's language does not seem consistent with modification but rather appears to indicate that it was either the employer's interpretation of the policy as it existed or simply a statement of intent not to comply with the policy from that point on. Therefore, there is a genuine issue of material fact as to whether and when the overtime policy became non-applicable to Kartheiser, or in the alternative, whether American Can breached the agreement when it set out its position in April or May of 1994.

### 2. Whether the Overtime Policy was Communicated to Kartheiser

The next element of the unilateral contract analysis is whether the Engineering Office Manual overtime policy was communicated to and accepted by Kartheiser so as to constitute acceptance of it. The record indicates that the manual was available for Kartheiser's use, that Kartheiser referred to the manual with regularity and that employees were actually paid under the terms of the overtime policy during Kartheiser's tenure as Maintenance Department Supervisor. Thus it was one facet of Kartheiser's work duties to refer to the Engineering Office Manual's overtime provisions. There is also an indication that American Can paid overtime to Kartheiser and others under the same policy for years. This is prima facie evidence that the policy was communicated to employees, even if only indirectly through bigger paychecks.

■ Because the policy was being followed at an earlier time, American Can had the responsibility to communicate to its employees any change in or termination of the policy if that was its desire. There is no evidence of any communication of non-applicability of the policy until April or May of 1994. Even if there was not such strong evidence of the policy being followed, the Court agrees with Kartheiser that its presence in the Engineering Office Manual in an area made available for Kartheiser's use at least creates a genuine issue of material fact as to the communication of the policy to him, and his acceptance of it.

### 3. Whether Kartheiser Provided Consideration

The Court next turns to the question of whether Kartheiser provided consideration in return for any overtime pay through continuing to work or otherwise. There is no issue over whether Kartheiser continued to work after becoming aware of this policy. He did. He was subject to the policy and received overtime under it while working as a foreman from 1987 to 1990. He then continued to work, now as Maintenance Department Supervisor, until 1996. Additionally, beginning in November of 1993, not only did Kartheiser continue to work, he assumed greater responsibilities, essentially "add[ing] the foreman's job to what [he] was already doing." Kartheiser Dep. 31.[4] Kartheiser also worked over

---

4. This assumption of greater responsibility was in keeping with a stated purpose of the overtime policy, which, by its terms, was to compensate supervisory employees for the oversight function they had to perform in addition to other duties. *See* Def. Ex. D, ¶¶ A, B, C(1).

forty hours per week during the time in question. Under the circumstances, there is a genuine issue of material fact regarding the consideration provided by Kartheiser.

### B. Whether the Disclaimer was Enforceable

 American Can claims that even if the overtime policy otherwise created an enforceable contract between itself and Kartheiser, the disclaimer contained in the H.R. Manual prevented the policy from being enforceable. In issuing disclaimers, employers seek to prevent an employee handbook or manual from forming a contract by clarifying the employer's intent not to make an offer. *See Phipps v. IASD Health Services Corp.,* 558 N.W.2d 198, 204 (Iowa 1997). In analyzing whether the disclaimer is enforceable, Iowa law requires that the disclaimer must be clear in its terms, and that coverage of the disclaimer is unambiguous. *See id.* In most cases, the disclaimer analysis is performed in tandem with the handbook policy sought to be enforced. *See, e.g., id.; Anderson,* 540 N.W.2d at 288–89; *French v. Foods, Inc.* 495 N.W.2d 768, 770 (Iowa 1993). Because the disclaimer here is in a different manual, it must be separately analyzed to determine its effect on Kartheiser's understanding of the overtime policy. The analysis is even more unusual because the Court has already found that the H.R. Manual, which contains the disclaimer, was not distributed or communicated to Kartheiser or other employees. *See* discussion III.A(2) *infra.*

 American Can cites *Anderson,* which states that it is "unnecessary that the particular employee seeking to enforce a promise made in an employee manual have knowledge of the promise," for the proposition that Kartheiser did not have to know about the disclaimer to be affected by it. *See* 540 N.W.2d at 285. It is certainly the law in Iowa that where a handbook is actually distributed to employees, a given employee need not have actual knowledge of a policy or disclaimer to enforce it or have it enforced against him

or her. *See id.* at 284. Here, however, Kartheiser correctly points out that there was no distribution of the H.R. Manual to him or other employees, and American Can does not claim that it otherwise communicated the disclaimer to him. Thus, the quoted holding from *Anderson* does not apply. *See id.* at 284–85; *see also McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989) ("Claims under unilateral contract theory frequently break down because ... there is no acceptance because the disciplinary provisions are never communicated to the employee") (citing *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919, 923 (1987) (no unilateral contract where employment policies not communicated to employee) & *Hoffman–La Roche, Inc. v. Campbell,* 512 So.2d 725, 734 (Ala.1987) ("[i]t is axiomatic that an offer must be communicated before it may be accepted")). Because the disclaimer was never distributed, actually or constructively, to Kartheiser, the Court is thus unable to apply the *Anderson* disclaimer analysis.

 Under a traditional contract analysis, an offer is not effective until it reaches the offeree. *See Anderson* at 283. The offeree must know of the offer before there can be mutual assent. *See id.* The offer of the disclaimer in this case was not effective because it was never communicated to Kartheiser. If the Court accepted American Can's argument, employers would be allowed to enforce the most oppressive policies and disclaimers against employees as long as they kept a copy of these policies and disclaimers hidden away somewhere in the bowels of the company's facility, never having distributed the handbook to employees. This Court cannot imagine the Iowa courts intended such a rule.

### IV. Plaintiff's Claim Under Iowa Code Chapter 91A

Defendant has also moved for summary judgment in Plaintiff's claim for wages and liquidated damages under the Iowa Wage

Payment Collection Act, Iowa Code § 91A. Actions founded on claims for wages under Chapter 91A are subject to a two-year statute of limitations. *See* Iowa Code § 614.1(8); *Hengesteg v. Northern Engineering, Inc.,* 478 N.W.2d 307, 309 (Iowa App.1991). Therefore any claim that Plaintiff may have had under the statute for wages owed prior to November 22, 1994 (two years before the filing of the original action in this matter), is barred. Because the claim under this chapter is based on Count I, however, the remainder of Count II survives along with Count I.

## V. Conclusion

Viewing the evidence in the light most favorable to Kartheiser, the Court finds that Kartheiser has shown genuine issues of material fact as to his reasonable expectation of coverage under the overtime policy upon the changing of his duties on November 1, 1993. Conversely, American Can has not shown that the Human Resources Manual's disclaimer was ever communicated to Kartheiser. Based on the foregoing, the Court finds that Defendant American Can's Motion for Summary Judgment should be, and is, DENIED as to Count I. Defendant American Can's Motion for Summary Judgment as to Count II is GRANTED with respect to any claim for relief arising before November 22, 1994, and DENIED in its remainder.

IT IS SO ORDERED.