**Joseph D. REVELL, Jr., Plaintiff,**

**Larry Plumb, Plaintiff,**

v.

**MAYTAG CORPORATION and Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local Union 997, Defendants.**

**Nos. 4:04–cv–00666, 4:04–cv–00667.**

United States District Court, S.D. Iowa, Central Division.

May 1, 2006.

■■■■■■

Elizabeth G. Kennedy, Ahlers Cooney Dorweiler Haynie Smith & Allbee, Des Moines, IA, Nathan John Overberg, Ahlers & Cooney PC, Des Moines, IA, for Defendants.

Joan M. Fletcher, Jeffrey A. Krausman, Dickinson, Mackaman, Tyler & Hagen, PC, Des Moines, IA, for Plaintiffs.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

PRATT, Chief Judge.

Before the Court are two cases, filed separately, but containing exceptionally similar issues. Defendant, Maytag Corporation ("Maytag") filed a Motion for Summary Judgment in each of the above captioned cases on December 16, 2005. *See* Clerk's No. 36 in Revell, Clerk's No. 29 in Plumb. Each Plaintiff filed a resistance to the Motion for Summary Judgment, Defendant Maytag replied, and each Plaintiff filed a sur-reply. A hearing was held on the matters on March 2, 2006. The matters are fully submitted.

## I. PROCEDURAL BACKGROUND

On October 27, 2004, each Plaintiff filed a Petition against Defendants in the Iowa District Court in and for Jasper County, Iowa. Each Plaintiff raised three causes of action: Violation of a Collective Bargaining Agreement, pursuant to Section 301 of the Labor–Management Relations Act of 1947 ("LMRA"); Breach of Employment Contract; and Promissory Estoppel. On November 30, 2004, Defendants removed each action to the United States District Court for the Southern District of Iowa, pursuant to 28 U.S.C. § 1446(b). Removal of Plaintiffs' LMRA claims was proper because this Court has original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Removal of the state claims was proper because the Court has supplemental jurisdiction "over all other claims that are so related to claims in the action" over which the Court has original jurisdiction. 28 U.S.C. § 1367. On August 17, 2005, Plaintiff Joseph Revell ("Revell") amended his complaint to assert additional state and federal causes of action for age discrimination.

■ On February 28, 2006, the parties in both actions filed stipulated notices of dismissal, pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii), agreeing to dismiss Count I of the Complaint. The parties also agreed to dismiss the Union Defendants from the present action. While no order of the Court is necessary to approve a stipulated dismissal pursuant to Federal Rule of Procedure 41(a)(1)(ii), the dismissal nonetheless appears as a Motion requiring a ruling on the Court's docket. Accordingly, for purposes of docket maintenance, the parties' Motion to Dismiss (Clerk's No. 47) is GRANTED. The Union Defendants, as well as Count I of the Complaint, are hereby dismissed. Thus, the only remaining claims in the case are Larry Plumb's ("Plumb") and Revell's claims for Breach of Contract and Promissory Estoppel against Defendant Maytag, and Defendant Revell's claims of age discrimination against Maytag.

## II. FACTUAL BACKGROUND

### A. *Joseph Revell*

Revell first became an employee of Maytag in approximately 1973. He initially worked in a job covered by a Collective

Bargaining Agreement ("CBA") between Maytag and the Union. In approximately late July, 1996, Revell had a conversation with Steven Matsen ("Matsen"), a quality control representative or technician with Maytag. During that conversation, Matsen told Revell that there was a job opening he wanted Revell to consider, and told Revell about the position and the benefits of taking it. While Revell recalls nothing further about his conversation with Matsen, he told Matsen he would consider the job. It was understood at the end of the conversation that if Revell decided he was interested, he should apply for the position.

Revell, did, in fact, apply for the position approximately one week after his initial conversation with Matsen. After applying, Revell was interviewed by Matsen, Dale Hargrave ("Hargrave"), the director of purchasing for Maytag, and Kevin Peska, a Buyer for Maytag. During the interview, Hargrave did most of the talking and told Revell what the job, a non-bargaining unit position, would entail and the work expectations associated with the position. During the interview, Revell expressed some questions and concerns about taking a non-bargaining unit position, as he had never held such a job before. Revell asked about his seniority rights as articulated in the CBA, and more specifically, whether he would have the ability to return to a bargaining unit position if the new, non-bargaining unit position did not work out. Revell claims Matsen told him that: "[A]ccording to the contract and—I don't know—I believe he said past practice, but according to the contract I had the right to return to the unit at any time at my request during the first year in this position and then after a year at the discretion of the company." Revell's App. at 13 (Revell Dep.). Several days after the interview, Revell received an offer to assume the non-unit position and was ulti-mately promoted to the position of metal specialist on August 12, 1996. Revell testified at deposition that, as a previous union officer, he "understood the contract language and ... just wanted to make sure that we [those present at the interview] all understood it the same way that I did.... If they had not agreed with my view of my bargaining rights being returned, my unit rights being returned at any time, then I would not have taken the position." *Id.* at 19.

After taking the metal specialist position, Revell moved to a data analyst position in the non-bargaining unit sometime in approximately 1997. He eventually switched to the position of scheduler, but on April 27, 2004, Revell's position as a non-bargaining unit scheduler was eliminated during a reduction in Maytag's workforce. Between one year after the commencement of his non-unit position and the time of his termination, Revell made several requests, some in writing, to return to a bargaining unit position, though he cannot recall the exact dates of his requests. Revell understood that, because the requests were made more than one year after assuming the non-bargaining unit position, the determination of whether he would return to the bargaining unit was within Maytag's discretion. *Id.* at 18. His requests were denied on the basis that there was no one to replace Revell in his non-bargaining unit position. After his termination, Revell again requested that he be allowed to return to a bargaining unit position, and his request again was denied.

While Revell admits that return to a bargaining unit position was subject to "management discretion," he asserts that past practices of Maytag led him to believe that he had a right to return to the bargaining unit. Revell testified: "Let me just state that management discretion in

the 25 years that I was there was, if a person was in good standing, a salaried person, you know, was not being terminated, was not accused of, you know, theft or sexual harassment or something, they could return to the unit, and the discretion part was you had to be in good standing, and if you were, you could go back in the unit. . . . My understanding was the discretion referred to is they got to pick the time frame you went back." *Id.* at 26. Revell further stated that he understood that, in certain positions, past practice dictated that a precondition of returning employees to the bargaining unit was that management would have to find a replacement for their non-unit position. *Id.* at 31. Revell was not aware of any other persons who had asked to be returned to the bargaining unit after 2001 whose request was not honored. *Id.* at 35. In summarizing the information he received during the interview, Revell stated:

> [T]he person doing the interviewing that I was going to work for had also come out of the unit and became a supervisor in quality control representative, so we both knew the same language. I believe he had been a union rep at one time also, so he—when I asked him the question and I made it clear I needed specific answers, he knew what I was asking and why I was asking it, so we discussed that.
>
> As I understand, that was really—other than the job responsibilities, that was my main focus in the interview from my side of it was, am I guaranteed that I can go back to the unit if I'm not happy with my salaried position?
>
> And there's three parts to that. You can go back in the first year. No harm, no foul is what we called it. The second part was you cannot go back into the unit to avoid disciplinary action as a salaried person. To paraphrase Steve [Matsen], you know, if you rape some-

body or kill somebody, you're going to lose your job. And, thirdly, the discretionary part or at the discretion of the company was solely focused on sometimes you're in a job where you are needed and it's going to take us a while to get you out of that job and put you back in the unit.

> And I had already worked there 18–some odd years and I had seen that happen before, so it was common knowledge and reiterated by the company representative that that was what that clause stood for or meant.

Revell.App. at 6 (Revell Dep.).

### B. *Larry Plumb*

Plumb first became an employee of Maytag in approximately September, 1976. Like Revell, Plumb worked for many years in a job covered by the CBA between Maytag and the Union. At some point in 1988, Plumb applied for a skilled trades job. Def.'s App. at 7 (Plumb Dep.). He was then approached by Maytag management about moving to a supervisory job outside the bargaining unit. Plumb was excited about the opportunity and viewed it as a positive way to better himself. He applied for the position and was interviewed by Al Heryford from Human Resources, as well as by other individuals he cannot now recall. Plumb does not recall many specifics of the interview, but does recall being told during the interview that he would have the option of returning to the bargaining unit during his first year in a non-unit position without losing his bargaining unit seniority:

> They explained to you how you had your—that you would never get laid off. . . . They explain to you that you had a year to go back to the unit without losing your seniority, and they explained to you how the vacation was different. You could use an hour at a time, funer-

als, Christmas parties, that you didn't have to use vacation. Shoot, I don't know. The stuff that they entice you to come to the supervision.... [Y]ou can be fired. Everybody can be fired.

*Id.* at 11. Plumb also recalls being told, though he cannot remember whether it was before or after starting the non-unit position, that he "would have a right, at [his] discretion, to return to the bargaining unit at any time during his employment outside the bargaining unit." *Id.* at 20 (Plumb Dep.) (discussing allegations of para. 25 of Compl.). Plumb acknowledges that, at some point in time, Maytag added a condition which would permit individuals outside the bargaining unit to return to the unit only if an adequate replacement could be found. Plumb's App. at 7.

Within about a month of being approached about the non-unit position, Plumb accepted a non-bargaining unit position. Plumb remained employed in various non-unit positions until his employment with Maytag was terminated in a reduction in work force on April 27, 2004. At the time he was terminated, Plumb requested that he be allowed to return to a bargaining unit position, but his request was denied. Plumb claims that several individuals with Maytag, including retired department head Tom Simpson and various union officials, told him after his termination that he had a right to return to the bargaining unit.

### C. *Other Facts*

As to Revell's breach of contract claim in Count II of the Complaint, Revell testified: "I felt I had the right to return to the unit based on both oral commitments, discussions with upper management, and written contract language, an agreement that was in place when I accepted the position." *Id.* at 20. Plumb claims that the employment contract allegedly breached by Maytag stems, in part, from the

contract language in the CBA. *Id.* at 18–19. Specifically, Plaintiffs rely on language in the CBA in force during their employment outside the bargainng unit. Article X, Section I, subparagraph D of the CBA states:

> **Seniority for Employees Entering From Out of Unit.** Effective June 1, 1971, Maytag Employees employed by the Company outside the Bargaining Unit who once worked in the Bargaining Unit shall retain seniority in the Bargaining Unit but shall not continue to accumulate seniority after June 1, 1972, except that if such Employee is returned to the Bargaining Unit within one (1) year from the date of his transfer out of the bargaining Unit he shall accumulate as Bargaining Unit seniority the period of time spent out of the unit.
>
> Employees who once worked within the Bargaining Unit will, upon their return to the Bargaining Unit, be placed in the same classification in the department from which they left the bargaining Unit, and will exercise their seniority under the downgrading procedure to find their location within such department.

Revell App. at 1.

Additionally, both Plaintiffs received a letter, dated August 30, 2000, regarding "Salaried Employees with Hourly Service." *Id.* at 2. The letter provided in pertinent part:

> On January 2, 1998, a letter ... was sent to Newton salaried employees with previous hourly credited service concerning a change in the ability to retire with unit benefits—both pension and retiree medical. That letter was sent to salaried employees who indicated in 1997 they had previously worked as an hourly employee for Maytag in Newton, Iowa.... Since that date several questions have arisen about the letter and

more employees have been transferred from hourly to salaried status.

Current practice allows Newton salaried employees with previous unit time to retire with unit benefits ... at their own option without actually working as an hourly employee on their retirement date. Effective May 31, 2001, this practice will no longer be allowed. In order for salaried employees to retire with hourly benefits after that date, they must declare by March 1, 2001 their intention to retire with hourly benefits. **Those that declare this intention will be returned to the unit at management's discretion, which is the same as the current practice.**

Revell App. at 2 (emphasis in original). On the second page of the letter, there is a series of questions and answers. In response to the question, "What is meant by management discretion?", the letter provides: "Management must maintain staffing to best meet business needs. This will dictate when transfers to the unit are made. Some employees may not be transferred until someone is properly trained to take that person's place." *Id.* at 3.

In support of his claims, Plumb notes that he also had a conversation, in approximately 1998 or 1999, wherein the plant manager told him and another supervisor "that you had to make up your mind on if you're going to retire out of the unit or the company. If you retired out of the unit, you had to go back to the unit, and the people that signed to retire out of the unit was going back, and my department head told me exactly the same thing." Pl.'s App. at 4 (Plumb Dep.). At that time, Plumb expressed his intent to retire with unit benefits, and expected to be transferred back to the unit. At some later point, however, he was told that he would not be required to return to the unit to retire with unit benefits. Pl.'s App. At 12.

Both Plaintiffs additionally cite several individuals who requested to return to the bargaining unit from non-unit positions whose requests were granted. Plumb, specifically, recalls an individual named Randy Rhoades filing a grievance when his job was eliminated, claiming that Article X gave him a right to return to the bargaining unit. Def.'s Supp.App. at 19 (Plumb Dep.). Plumb claims that Rhoades' job was eliminated, but that after his grievance, he was allowed to return to the bargaining unit, though Plumb acknowledges that Rhoades dropped the grievance when he was offered and accepted a severance package. *Id.* at 20. Plumb also cites Pat Griffin, Mike Cark, Larry Steffen, Robert Anderson, Tim Etter, Clayton Cooper, Butch Clark, and Steve Bookout as individuals who went from salaried non-unit positions back into positions in the bargaining unit. Plumb's App. at 16. Plaintiffs have both included in their appendices an affidavit from Charlotte A. Witte, attesting to her return to the unit from a non-unit position, and the fact that, to her knowledge, "no employee who had worked in the bargaining unit was ever denied the right to return to the bargaining unit during my nearly eighteen years of employment." *See* Revell App. at 15.

## III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1 st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see*

*also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

It is the unusual case where the party shouldering the burden of proof prevails on a summary judgment motion. *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 5(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in origi-

nal). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## IV. LAW AND ANALYSIS

### A. *Count II—Breach of Contract*

■ To succeed on a claim for breach of contract, each Plaintiff must establish by a preponderance of the evidence the following: 1) that the parties were capable of contracting; 2) that a contract existed between the Maytag and the Plaintiff at issue; 3) the existence of consideration; 4) the terms of the contract; 5) that the Plaintiff at issue performed what the contract required of him; 6) that Maytag breached the contract; and 7) that the Plaintiff at issue suffered damage as a result of Maytag's breach. *See Magnusson Agency v. Public Entity*, 560 N.W.2d 20, 25 (Iowa 1997) (noting that the party seeking recovery on the basis of the contract has the burden of proving the existence of a contract in the first instance). Maytag asserts that neither Plaintiff can establish the first, second, fourth, or sixth elements necessary to establish their claims of breach of contract.

#### 1. *Authority.*

Defendant asserts that none of the Maytag employees conducting interviews with either Plaintiff had actual or apparent authority to bind Maytag to a representation, assuming one was made, that an employee had an absolute right to return to the bargaining unit from a non-unit position. The parties are in agreement that had either Plaintiff requested to be returned to a bargaining unit position within their first year of non-unit employment, they would

have had such a right. Neither Plaintiff made such a request, however. The parties further agree that both Plaintiffs were told that, after one year in a non-unit position, return to the bargaining unit would be at "management's discretion." Plaintiffs both argue that they were assured verbally that return to the bargaining unit after one year was a right, subject only to management's ability to replace them in their non-unit position. Plaintiffs do not claim that such assurances were in the form of direct statements. Rather, in support of this proposition, Plaintiffs both rely on the language of Article X of the CBA, the alleged representations of various Maytag employees, the August 30, 2000 letter describing "management discretion," and the fact that each Plaintiff was unaware of any Maytag employee who was not permitted to return to a bargaining unit position at some point after requesting such a change.

Revell does not appear to urge that Steve Matsen had actual authority to bind Maytag by his representations to Revell during his non-unit employment interview. Likewise, Plumb does not argue that Al Heryford had actual authority to bind Maytag by his representations to Plumb. Rather, Plaintiffs both argue that the respective interviewers each had apparent authority to bind Maytag to alleged representations that each had a "right" to return to positions within the bargaining unit.

■ The burden is on Plaintiffs to establish apparent authority. *See Waukon Auto Supply v. Farmers & Merch. Sav. Bank*, 440 N.W.2d 844, 847 (Iowa 1989). The question is a factual one, focusing on the actions of the principal. *Id.* Apparent authority has been described as follows:

A fundamental principle of agency law is that whatever an agent does, within the

scope of his or her actual authority, binds the principal. *Dillon v. City of Davenport*, 366 N.W.2d 918, 924 (Iowa 1985). In addition, all acts and contracts of an agent, which are within the apparent scope of authority conferred on him or her, are also binding upon the principal. *FS Credit Corp. v. Troy Elevator, Inc.*, 397 N.W.2d 735, 740 (Iowa 1986) (relying on *Mayrath Co. v. Helgeson*, 258 Iowa 543, 548, 139 N.W.2d 303, 306 (1966)).

Apparent authority is authority which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing. *Id.* (relying on *Helgeson*, 258 Iowa at 548, 139 N.W.2d at 306). Apparent authority must be determined by what the principal does, rather than by any acts of the agent. *Waukon Auto Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 847 (Iowa 1989). *Magnusson*, 560 N.W.2d at 25–26. In the present context, Defendant urges that no actual offer of employment was made by either Matsen or Heryford during the course of the interviews, and thus, no apparent authority could have existed to bind Maytag to any representations made during the interviews. The Court disagrees. A reasonable jury could find that, when Maytag presumed to have Heryford and Matsen conduct interviews with the respective Plaintiffs for the purposes of informing them about the requirements and responsibilities of a non-unit position, it clothed them with the apparent authority to accurately answer questions about the positions posed by the Plaintiffs. Defendant offers no case law supporting the proposition that Plaintiffs were required to ask and receive answers anew to their questions at the time they were actually offered non-unit positions, merely because no employment offer was made coterminously with the interview. Indeed, such a conclusion is entirely inconsistent with the well-established and well-accepted definition of apparent authority.

2. *Existence of a contract.*

■■■ Defendant next argues that no contract actually existed between either Plaintiff and Maytag because there was no mutual assent between the parties. "All contracts must contain mutual assent." *Magnusson*, 560 N.W.2d at 26 (citing *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995)). "This assent is usually given through an offer and acceptance." *Id.* "An offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* (quoting *Anderson*, 540 N.W.2d at 285).

■■■ There is no dispute that both Plaintiffs were subject to the at-will termination doctrine. "An at-will employee can be discharged from employment at any time, for any lawful reason." *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996) (citing *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989)). While common exceptions to the at-will employee doctrine include discharges in violation of public policy, discharges in violation of employee handbooks which constitute a unilateral contract, and discharges in violation of a covenant of good faith and fair dealing, the Iowa Supreme Court has "only adopted the first two recognized exceptions to the doctrine. We have consistently refused to adopt a covenant of good faith and fair dealing with respect to at-will employment relationships. Thus, the traditional doctrine of permitting termination 'at any time, for any reason, or no reason at all,' is now more properly stated as permitting 'termination at any time for any *lawful* reason.'" *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281

(Iowa 2000) (internal citations omitted, emphasis in original); *see also Fry*, 554 N.W.2d at 265 (stating that Iowa case law has recognized only two narrow exceptions to the at-will doctrine: 1) "when the discharge is in clear violation of 'well-recognized and defined public policy of this State'"; and 2) "when a contract created by an employer's handbook or policy manual guarantees an employee that discharge will occur only for cause or under certain conditions.") (citing *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993)). Plaintiffs here do not state a claim under the public policy exception, but rather appear to be making a claim that a contract arose from documents and information provided by Maytag as they commenced their non-bargaining unit employment, as well. as additional documents provided to them later in that employment. *See Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894 (8th Cir.2004) (stating that for the public policy exception to apply, there must be a clearly defined public policy protecting an activity, and additionally stating that the public policy must clearly "imply a prohibition against termination from employment to avoid undermining the policy").

Clearly, while employed in a bargaining unit position, and while covered by the provisions of the CBA, certain exceptions to the at-will employment doctrine were applicable, *i.e.*, Maytag had agreed, through the terms of the CBA, that certain employment decisions would be made only if consistent with that contract. Plaintiffs admit, however, that the non-bargaining unit position each occupied at the time of his termination was not covered by the terms of the CBA. Thus, it would appear that Plaintiffs are claiming that, both through the representations allegedly made during their pre-employment interviews, and through language found in Article X of the CBA and, later, in the August 30, 2000 letter, each had contracted with Maytag for employment in a non-unit position that gave them a "right" to return to a bargaining unit position at any time, though subject to "management discretion."

▇ Assuming the facts as alleged by Plaintiffs to be true, there was no mutual assent between the parties such that a binding legal contract was formed guaranteeing either Plaintiff an absolute right to return to the bargaining unit. The Iowa Supreme Court discussed the enforceability of pre-employment representations in *Fry v. Mount*. In *Fry*, the Plaintiff claimed that, during a pre-employment interview, he was told that he would enjoy long-term employment with the Defendant employer. *Fry*, 554 N.W.2d at 267. Finding that summary judgment was appropriate on Plaintiff's negligent misrepresentation claim, the Court concluded that the defendant's representation was made to "'sell' Fry on their company, not to guide him with professional employment advice." *Id.* The following year, in *Thompson v. City of Des Moines*, 564 N.W.2d 839, 843 (Iowa 1997), the Court reviewed similar circumstances in a claim for breach of oral contract. In *Thompson*, the Plaintiff based his claim that an oral contract was formed on statements made by the city manager during his hiring interview. *Id.* at 844. The Plaintiff "recalled that the 1974 interview left him with the impression that the job would be his as long as he wanted it unless he made some mistake warranting termination." *Id.* In concluding that Thompson's claim failed as a matter of law, the Court stated: "Just as in *Fry*, [the city manager] was trying to 'sell' Thompson on employment with the City of Des Moines. They were not negotiating the terms of a binding contract for lifetime employment." *Id.*

On the present facts, each of the Plaintiffs expressed a belief that they had an absolute right to return to a bargaining unit position after one year. The statements made by Maytag interviewers, however, do nothing to support this conclusion. Revell claims that Matsen told him: "[A]ccording to the contract and—I don't know—I believe he said past practice, but according to the contract I had the right to return to the unit at any time at my request during the first year in this position and then after a year at the discretion of the company." Def.'s App. at 13 (Revell Dep.). Plumb also recalls being told, though he cannot remember whether it was before or after starting the non-unit position, that he "would have a right, at plaintiff's discretion, to return to the bargaining unit at any time during his employment outside the bargaining unit." Def.'s App. at 20 (Plumb Dep.) (discussing allegations of para. 25 of Compl.). In neither case do Plaintiffs point to any evidence, other than their personal beliefs that Maytag always allowed employees in good standing to return to the bargaining unit, indicating that management was not entitled to exercise its discretion by refusing an employee a return to the unit.

■ Moreover, at the time that each Plaintiff was purportedly promised an absolute right to return to the bargaining unit, no offer of employment, nor acceptance thereof was made. Thus, until such time as each Plaintiff was actually offered a non-unit position, there was no expression of Maytag's willingness to enter into a bargain such that either Plaintiff would have been justified in believing that his "assent to that bargain is invited and will conclude it." *Magnusson*, 560 N.W.2d at

26 (citations omitted). As such, neither Plaintiff has established any offer of a guaranteed right to return to the bargaining unit, as the pre-employment statements made by Maytag representatives do not serve as a basis to form an oral contract. Likewise, based on the reasoning of *Fry* and *Thompson*, the Court must conclude that the representations of Hereford and Matsen during the Plaintiffs' interviews were, at best, negligent misrepresentations, which are not actionable under Iowa employment law pursuant to *Fry*. To the extent Plaintiffs believed they were guaranteed a return to the bargaining unit at their request, that contention is belied by the undisputed fact that both Plaintiffs, at some time after being employed outside the unit for more than a year, requested to return to the bargaining unit, but the requests were never granted.[1] Certainly this should have alerted Plaintiffs that their understanding of management discretion may well be inaccurate. Finally, despite Plaintiffs' belief that no employee was denied return to the bargaining unit, Plaintiffs have adduced no evidence that management discretion was ever exercised to permit employees to return to the bargaining unit after the elimination of their non-unit positions, or that such an action would have been inconsistent with past practices at Maytag.

3. *Certainty of terms and requirements.*

■ Even assuming that mutual assent was given and a contract was formed, Plaintiffs' claims also fail under the requirement that a contractual obligation be "certain as to its terms and requirements." *Magnusson*, 560 N.W.2d at 26 (citing *Au-*

[1] Revell contends that he asked several times to return to the bargaining unit, but was told no replacement was available for his non-unit position. The evidence currently before the Court only supports the conclusion that Revell was given this reason one time, as opposed to every time he made the request.

*dus v. Sabre Comm'ns Corp.*, 554 N.W.2d 868, 871 (Iowa 1996)). To find that an oral contract was created with either Plaintiff, there must be "sufficient evidence of [the contract's] terms to ascertain the duties and conditions established." *Audus*, 554 N.W.2d at 871. Moreover, for an oral contract to be found and enforceable, the terms must be so "definitely fixed so that nothing remained except to reduce the terms to writing." *Daughton v. Parson*, 423 N.W.2d 894, 898 (Iowa Ct.App.1988) (quoting *Marti v. Ludeking*, 193 Iowa 500, 185 N.W. 476, 477–78 (1921)).

 Here, both Plaintiffs concede that their right to return to the unit was at "management's discretion," but insist management could not exercise its discretion to deny their return to the unit altogether. Rather, Plaintiffs argue that management was required to exercise its discretion in such a way as to return them to the unit once the non-unit position could reasonably be filled. Plaintiffs contend that "[t]he agreement of the parties is based on their shared understandings of the companies past practices and the collective bargaining language which protected salaried workers' seniority." Revell Br. at 6. The Court cannot agree that either the oral representations, the CBA, or even the August 30, 2000 letter, are sufficient to establish a clearly defined term of an oral contract. First, neither Plaintiff has offered any testimony showing that they discussed the meaning of the term "management discretion" during their pre-employment interviews. Rather, both stated plainly their understanding that "management discretion" conditioned their return to the bargaining unit after one year had passed. The phrase "discretion" is commonly understood to mean: "Individual judgment; the power of free decision-making." Black's Law Dictionary (8th ed.2004). Despite this commonly understood meaning

conflicting with Plaintiffs' own stated understanding of the term, neither asked any questions or received any responses that would reasonably indicate that that discretion at Maytag translated into an absolute right. Indeed, the notion that the at-will employment doctrine was not altered in this case is given weight by the fact that Plaintiffs both clearly understood that they could be fired from their non-unit positions for illegal acts or misbehavior. Yet neither Plaintiff sought further clarification of how the exercise of management discretion might apply to termination due to downsizing, or cases where an adequate replacement for the non-unit positions could not be found or was not even needed.

Article X of the CBA offers nothing to support Plaintiffs' conclusion that they had an absolute right to return to the bargaining unit. Indeed, Plaintiffs admit that as non-unit employees, they were not covered by the terms of the CBA. Moreover, Article X of the CBA specifically discusses how seniority rights of bargaining unit employees are affected by taking non-unit positions, and how those same seniority rights are affected when one returns to the bargaining unit from a non-unit position. Nothing in the language of Article X clearly states a right to return to the bargaining unit under any circumstances, let alone following termination due to a reduction in work force.

Likewise, Plaintiffs' reliance on the August 30, 2000 letter is misplaced. That letter clearly references retirement rights of Maytag employees who, like Plaintiffs, previously had accrued work time in bargaining unit positions. The letter clarifies that non-unit personnel with prior bargaining unit positions must declare their intention to retire with bargaining unit benefits by making an election attached to the letter. The letter states that those non-unit employees who choose to retire with bar-

gaining unit benefits "will be returned to the unit at management's discretion, which is the same as the current practice." Management's discretion is defined as follows: "Management must maintain staffing to best meet business needs. This will dictate when transfers to the unit are made. Some employees may not be transferred until someone is properly trained to take that person's place." *Id.* at 3. There is no indication anywhere in the letter that the definition of management's discretion is meant to apply to anything other than retirement situations. To bootstrap that definition to a promise allegedly made years before is without legal precedent. Even if the language could be so construed, there is nothing in the definition of management discretion stating that management does not retain the discretion to refuse a transfer, how discretion should be exercised in cases of workforce reductions, or otherwise indicating that employees have an absolute right be transferred. Likewise, there is no evidence in the record tending to prove that, even if a right to transfer existed, that it could be exercised *after* an employee's termination. Plaintiffs rely on vague promises and their own subjective understanding of what those promises meant. This is insufficient evidence from which a reasonable jury may infer a clear and definite contractual right.

### B. *Count III—Promissory Estoppel*

■ To establish a claim for promissory estoppel, each Plaintiff must prove the following elements: "(1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise." *Schoff v.*

*Combined Ins. Co. of America,* 604 N.W.2d 43, 49 (Iowa 1999). Defendant urges that neither Plaintiff can satisfy the first two elements necessary to maintain their claims.

### 1. *Clear and definite promise.*

■ The Iowa Supreme Court has clearly articulated the strict level of proof necessary to show a clear and definite promise:

> We start our analysis with a discussion of the meaning of the requirement that the plaintiff prove a clear and definite promise. A "promise" is "[a] declaration ... to do or forbear a certain specific act." A promise is "clear" when it is easily understood and is not ambiguous. A promise is "definite" when the assertion is explicit and without any doubt or tentativeness....

*Id.* at 50–51 (citations omitted). The Court distinguished the definition of a promise from that of a misrepresentation, that is, "a statement ... made to convey a particular view or impression of something with the intention of influencing opinion or action." *Id.* at 51. A claim for promissory estoppel cannot lie on a mere misrepresentation:

> Although this distinction may appear to be a technical one, it is of utmost importance. If we do not make a firm and clear distinction between a promise and a representation, discharged employees could simply characterize negligent misrepresentations as promises and thereby avoid our rule that employees may not recover for negligent misrepresentations made by an employer or potential employer. Consequently, we will not imply a promise from representations made by an employer, but will require strict proof that the defendant promised to do or not to do a specific act, and did not simply

state the employer's view or impression of something. *Id.* at 51. In support of their arguments that Maytag made promises, rather than representations, each Plaintiff asserts that he would not have accepted the position without a clear and definite promise and specific answers about his return rights. Revell states that he "specifically asked if he could return to his position in the unit if he was unhappy as a salaried employee," and that Maytag "gave him an answer to a 'specific' question which it knew Revell would rely on." Revell Br. in Resistance at 9. Plumb, likewise, states that "he remembers he was told of his return rights as a part of the inducement to 'get [him] to take the job.'" Plumb Br. in Resistance at 10. Thus, he concludes, "Maytag made statements which it knew Plumb would rely upon." *Id.*

Plaintiffs cite *DeSanzo v. Titanium Metals Corp.,* 351 F.Supp.2d 769 (S.D.Ohio 2005), as a similar factual case that supports Plaintiffs' promissory estoppel claims. In *DeSanzo,* Plaintiff Valle worked as part of a collective bargaining unit, but moved to a supervisory position outside the unit. *Id.* at 773. In July 2002, Valle received a letter from his union telling him that the CBA had been amended to provide that employees had a right to return to the bargaining unit for only one year after assuming a non-unit position, rather than the two years provided for in the previous CBA. *Id.* The letter also stated that supervisory non-unit employees had until August 2002 to elect return to the unit. *Id.* At the time of this letter, employees at Defendant corporation, including Valle, were well aware that a reduction in work force was going to occur. *Id.* Valle sought to find out whether he was likely to be involved in the reduction before making an election to return to a unit position. *Id.* Valle discussed the matter with the Human Resources Director,

and was told "Don't worry about it, you got a good—you got a good evaluation." *Id.* at 774–75. Valle was also aware that another supervisory employee had been informed by the company that he was likely to be involved in the downsizing, and thus elected to return to the bargaining unit. *Id.* Based on this information and a belief that the Human Resources Director had clearly implied that his job was safe, Valle elected not to return to the bargaining unit. *Id.* On August 27, 2002, Valle received a letter informing him that he had been selected for termination. *Id.*

Valle asserted claims for breach of implied contract and promissory estoppel under Ohio law. *Id.* at 777. Defendant moved for summary judgment on the ground that Valle was never made a "specific promise of job security." *Id.* at 779–80. Recognizing that an employer's mere promise to be fair during layoffs is insufficient to support an exception to the at-will employment doctrine, the Ohio Court nonetheless denied the motion for summary judgment, concluding that Valle had adduced sufficient evidence to take the issue of specific promise to a jury. *Id.* Specifically, the court noted that Valle had been told "not to worry" by a superior and knew that one other employee was told that he would likely be reduced by management. *Id.* Valle was also asked, following distribution of the letter but before the deadline for election, if he would be interested in assuming his supervisor's position upon the supervisor's retirement. Finally, while the plant manager had been considering Valle for reduction as early as the end of July 2002, he gave Valle no indication of this when Valle specifically asked him about the upcoming reductions. *Id.* at 773.

The present case is readily distinguishable from *DeSanzo.* There, Valle specifi-

cally questioned his superiors on the likelihood that he would be terminated in the reduction in workforce during the short period of time in which he was expected to make an election between returning to the bargaining unit or remaining in his non-unit position. Despite having information that his position was in jeopardy, Valle was told "not to worry about it", and was given an indication that he might be able to assume his own supervisor's position in the future, despite the fact that another employee was given truthful information that he was likely to be reduced, permitting that employee to elect to return to the bargaining unit and ensure continued employment. Here, however, prior to even assuming non-unit positions, Plaintiffs were told merely that after one year in a non-unit position, their return to the bargaining unit would be at "management's discretion." At no point in time did anyone with Maytag promise or even imply to either Plaintiff that "management discretion" would be exercised such that they could return to the bargaining unit if their non-unit position was terminated. Nor did anyone from Maytag clearly define "management's discretion" at the time of Plaintiffs' job interviews, such that Plaintiffs reasonably could be found to have relied on such a definition. Indeed, nearly eight years had passed between Revell's job interview and his termination, and approximately sixteen years had passed for Plumb.

Just as in *Schoff*, Plaintiffs here do not claim that they ever discussed their rights to return to the bargaining unit in the event their termination was precipitated by a reduction in workforce. Nor did Plaintiffs ever request and receive a clear statement that management would forego terminating their employment in favor of returning them to the bargaining unit if such a circumstance arose. To constitute a promise within the meaning of promisso-ry estoppel analysis, Plaintiffs must show a promise that is explicit and unambiguous. *Schoff*, 604 N.W.2d at 51. Given the conceded statement by Maytag employees that Plaintiffs, after one year, could return to the bargaining unit "at management's discretion," Plaintiffs were not unambiguously guaranteed an absolute right to return to the bargaining unit if their non-unit positions were terminated. Accordingly, the Court cannot conclude that a promise was made, let alone that it was clear and explicit.

Moreover, as discussed in the contract analysis, *supra*, the CBA language, even if deemed applicable to Plaintiffs, only discussed rights of seniority upon return to the bargaining unit and does not, on its face, appear to have any bearing on the question of when and if return to the bargaining unit from a non-unit position would be permitted. Likewise, the August 30, 2000 letter pertained specifically to the ability of non-unit employees with prior bargaining unit experience to retire with unit benefits. The definition of management discretion included therein offers no insight or applicability to the question of when and if return to the bargaining unit for any reason would be permitted. Even if the letter is applicable to Plaintiffs' claims, it is not worded in such a way that it would preclude management from making the decision not to permit terminated employees to exercise a questionable right to return to the bargaining unit.

2. *Promise made by promisor with clear understanding that promisee was seeking an assurance upon which he could rely and without which he would not act.*

While both Revell and Plumb claim that they asked questions about their bargaining unit return rights because they were concerned about their jobs, there is

no evidence in the record showing that the Maytag interviewers were aware that either Revell or Plumb was seeking an assurance that they could return to the bargaining unit under virtually any circumstances, let alone the specific circumstances here at issue. Nor is there any evidence in the record from which a reasonable fact finder could infer that either Matsen or Hereford clearly understood that, without such a promise, either Plaintiff would decline a non-bargaining unit position. Accordingly, Plaintiffs' claims of promissory estoppel fail on this element of the analysis as well.

### D. *Revell's Age Discrimination Claims*

Revell offered no resistance to Defendant's Motion for Summary Judgment regarding his claims of age discrimination. Local Rule 7.1(e) provides: "Each party resisting a motion must, within 14 days after the motion is served, serve and file a brief containing a statement of the grounds for resisting the motion and citations to the authorities upon which the resisting party relies...." Local Rule 7.1(f) provides: "If no timely resistance to a motion is filed, the motion may be granted without prior notice from the Court." In light of Revell's failure to resist Defendant's motion for summary judgment, the motion is GRANTED as to Revell's age discrimination claims.

### V. CONCLUSION

For the reasons stated herein, Plaintiffs' Motions to Dismiss (Case # 4:04–cv–00666, Clerks No. 47; Case # 4:04–cv–00667, Clerk's No. 40) are GRANTED. Defendant's Motion for Summary Judgment (Case # 4:04–cv–00666, Clerk's No. 36) as to Plaintiff Revell is GRANTED on all counts. Likewise, Defendant's Motion for Summary Judgment (Case # 4:04–cv–00667, Clerk's No. 29) as to Plaintiff Plumb is GRANTED on all counts. The Clerk of

Court is directed to enter judgment in favor of Defendant in both of the above captioned cases.

IT IS SO ORDERED